IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


MEGA CONCRETE, INC., et al.    :      CIVIL ACTION
                               :
            v.                 :
                               :
MICHAEL SMITH, et al.          :      NO. 09-4234


MEMORANDUM

McLaughlin, J.                                    March 23, 2011


        Plaintiffs Mega Concrete, Inc., Mega Sitework, LLC, and
Capponi Enterprises, Inc., filed suit against two former
employees, Michael Smith and Kimberly Lawson, as well as six
individual defendants and six corporate defendants, who they
allege conspired and collaborated with the employees to steal
payments, resources, manpower, and business opportunities that
rightfully belonged to the plaintiffs.  The amended complaint
brings claims for violations of the Racketeer Influenced and
Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d),
and the Lanham Act, 15 U.S.C. § 1125(a), as well as state law
claims of fraud, civil conspiracy, conversion, tortious
interference with existing and prospective contractual relations,
unjust enrichment, and aiding and abetting breach of fiduciary
duty.

        Four of the defendants, Mr. Smith, Paramount Concrete
Construction, Inc., Jerry Frajdenberg, and U.S. Concrete, Inc.,
have answered the complaint, and Frajdenberg and U.S. Concrete

have cross-claimed against Mr. Smith.  Ms. Lawson has not responded to the complaint and default has been entered against her.  Two defendants, Ira Goldberg and Beyond Concrete, Inc., were voluntarily dismissed from the case.  Three groups of defendants, encompassing three corporate defendants and four individual defendants, have moved to dismiss all of the claims against them.  The moving defendants are Shoemaker Construction Company, Roger Ball, Plumbline Construction, Inc., John Matter, Andrew Uhrik, Chesco Coring & Cutting, Inc., and Todd A. Cliggett.

The Court will grant the motions to dismiss all of the RICO and Lanham Act claims against the moving defendants for failure to state a claim.  Per the agreement of the parties, the Court will limit this decision to the plaintiffs' federal claims. The Court will confer with the parties as to how they wish to proceed with respect to the remaining state law claims against the moving defendants.

I.    <u>Plaintiffs' Complaint</u>[1]

    A.    <u>Facts</u>

        1.    <u>Mega Construction and Michael Smith</u>

The plaintiffs collectively conduct business under the trade name "Mega Construction" ("Mega").  Mega is a Pennsylvania construction company that typically works as a subcontractor on commercial projects throughout the Delaware Valley Region.  Once Mega is awarded a particular project, the essential terms of the project are written into a subcontract, and the project is recorded in Mega's accounting system and assigned a "job number" so that Mega can track work performed, payments received or made, the amount of the original contract, change orders, and open balances.  Mega also maintains records of which employees are assigned to which project ("manpower schedules") and of the location of its equipment on a particular date.  Am. Compl. ¶¶ 22-36.

In August 2004, Mega hired Michael Smith as an estimator/project manager and in January 2006 he was promoted to

_____

[1] In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must accept all well-pleaded facts as true, but should disregard any legal conclusions.  The court must then determine whether the facts alleged are sufficient to show that the plaintiff has a "plausible claim for relief."  <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009).  If the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, then the complaint has alleged, but it has not shown, that the pleader is entitled to relief.  <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009).

Chief Operating Officer.  In this role, Smith was responsible for preparing bids, negotiating contracts, overseeing projects, assigning manpower and equipment to various projects, purchasing and inventory of materials, and change order requests for any additional work performed.  Smith acted as a liaison with the general contractors or Mega's own subcontractors.  Am. Compl. ¶¶ 37-39.

Smith was also responsible for coordinating any changes to Mega's scope of work on a project, including estimating and negotiating the price to be charged for the change.  "Change orders" are usually issued by the general contractor and document any modification to the scope of work, contract sum, or amount of time required to complete the project.  Am. Compl. ¶¶ 40-42.

According to the complaint, in 2005, Smith began implementing a scheme to divert revenue and business opportunities from Mega.  Smith recruited Kimberly Lawson, Smith's personal assistant and an accounting clerk/bookkeeper for Mega, to assist him in this scheme.  Smith also used Paramount Concrete Construction, Inc., a company he secretly owned and operated while working at Mega, to carry out his scheme. Throughout the life of this alleged scheme, Smith recruited and coordinated the activities of the other defendants, and stole revenue, materials, equipment, and business opportunities from Mega.  Smith's scheme was uncovered on or around September 17,

2008, at which time he was terminated by Mega.  Am. Compl. ¶¶ 45-48, 69-70.

Although the allegations in the amended complaint cover numerous defendants and permutations of Smith's scheme, the Court will limit its discussion to the allegations involving the moving defendants.


2.  <u>Shoemaker Defendants and the Locust Towers Project</u>

Shoemaker Construction Company ("Shoemaker") is a Pennsylvania limited liability company that is owned and operated by Roger Ball.  These two defendants are together referred to as the "Shoemaker defendants."

In early 2006, Shoemaker entered into an agreement with 1419 Tower L.P. to provide general contracting services in connection with the Locust Towers Project, which involved the rehabilitation and conversion of a former office building into a luxury condominium.  On behalf of Mega, Smith submitted a bid to Shoemaker to perform the cast in place concrete work for the Locust Towers Project.  Mega began performing the concrete work in November 2006, before the terms of the subcontract had been reduced to writing.  Thereafter, on January 30, 2007, Mega and Shoemaker signed a subcontract dated March 24, 2006.  The total value of the Locust Towers Project subcontract between Shoemaker and Mega was $196,330, subject to additions and deletions by

change order.  Am. Compl. ¶¶ 76-81; Ex. 1 to Am. Compl.[2]

Although Mega's work on the Locust Towers Project did not begin until 2006, the plaintiffs assert that the scheme involving the Locust Towers Project began in early 2005 when Smith solicited Shoemaker, through Ball, to participate in his scheme to defraud the plaintiffs.  Mega alleges that Smith, Lawson, Paramount, and Shoemaker conspired to "dupe" Mega into performing additional work on the Locust Towers Subcontract and retain the additional payments due to Mega for themselves.  Am. Compl. ¶¶ 75, 82.

Specifically, Mega asserts that the Shoemaker defendants and Smith "devised a means to divert payments due to Mega Construction for work performed pursuant to the Locust Towers Subcontract through the manipulation of change orders." According to the complaint, in response to Shoemaker's requests for additional work, Mega submitted various proposed change orders.  The plaintiffs allege that Shoemaker approved many of the change order requests, "but for a substantially lower dollar value than what was initially proposed in furtherance of the scheme to defraud" the plaintiffs.  In total, Shoemaker approved six change orders for additional work in connection with the Locust Towers Subcontract totaling $89,467.00.  Am. Compl. ¶¶ 83-

---

[2] All exhibit references reflect those attached to the plaintiffs' amended complaint, unless otherwise noted.

85; Ex. 2.

The plaintiffs state that Smith, on behalf of Mega, submitted a proposal to perform additional patching and infill work at a price of $125 per hole, and that the owner of the building authorized this additional scope of work. Thereafter, in October 2006,[3] Mega performed patching work on 1,629 holes at the project. In July 2008, Mega discovered signed work orders related to the Locust Towers patching work that had never been submitted for payment and Mega immediately submitted a change order request for this additional work in the amount of $203,625.00. Shoemaker, however, issued a change order for the patching work for only $34,250 and never paid Mega for any of the patching work. The complaint alleges that the owner of the project had authorized and paid for the entire amount of the patching work, but that Smith, with the assistance of Lawson and Shoemaker, took the payment for the patching work as a "skim for themselves", Paramount, and "other defendants." Am. Compl. ¶¶ 85-68; Ex. 3.

On May 10, 2007, Mega and Shoemaker entered into a second subcontract for "slab repair" work at the Locust Towers Project. The Slab Repair Subcontract was for $89,498, but over the course of the project, Shoemaker approved several change

_____

[3] Although this is the date provided by the plaintiffs, it seems to conflict with their assertion that work began on the project in November 2006.

orders for additional work in connection with this subcontract, which caused Mega to perform a total of $164,592 of slab repair work. According to the complaint, although the owner of the project paid for all of the slab repair work, Mega was never paid for the additional work, because "Ball, Smith and Shoemaker agreed to revise the change orders issued to Mega for this completed work to reduce the amount to be paid to Mega... to only $89,498." The plaintiffs allege that Smith, Ball, Shoemaker and Paramount kept for themselves approximately $75,000 of the payments due to Mega for slab repair work. Am. Compl. ¶¶ 86-88; Exs. 4 & 5.

The plaintiffs assert that Mega performed $629,744 worth of work in connection with the Locust Towers Project, but were only paid $315,480.60 "because Defendants, through the manipulation of change orders and other construction documents, diverted at least $314,263.40." The plaintiffs believe that the owner of the Locust Towers Project paid Shoemaker the full amount of $629,744, but that Shoemaker, Smith, Lawson and Paramount took for themselves the difference between what the owner paid and what Mega received. Am. Compl. ¶¶ 89-91.

The RICO Case Statement lists various predicate acts of mail and wire fraud committed by the Shoemaker defendants, many of which repeat the allegations in the complaint and allege that various documents and payments related to the Locust Towers

scheme were sent through the mail or wires.[4]


### 3. Rite Aid Project and Plumbline Defendants

Plumbline Construction, Inc., is a Pennsylvania corporation owned and controlled by Andrew Uhrik and John Matter. These three defendants are together referred to as the "Plumbline defendants."

Beginning in early 2008, Plumbline was acting as the general contractor on the Rite Aid Project, a renovation of a Rite Aid pharmacy in Philadelphia. The complaint alleges that the scheme involving the Rite Aid Project began in "early 2008" when Smith recruited the Plumbline defendants to participate. By email dated May 13, 2008, Smith submitted a price quote of $324,375 to Plumbline for subcontracting work on the Rite Aid Project. The email indicated that the price could be reduced by $50,675 if crushed stone could be substituted for a product known as cellular fill. In a second email to Plumbline dated July 9, 2008, Smith reduced the price of the bid on the Rite Aid project to $232,000. The plaintiff contends that there was no substitution of stone for cellular fill. The revised bid

---

[4] The Shoemaker defendants challenge the plaintiffs' reliance on the RICO Case Statement in their opposition to the motions to dismiss. For the purposes of a motion to dismiss, however, the RICO Case Statement is a pleading that can be considered part of the operative complaint. See Lorenz v. CSX Corp., 1 F.3d 1406, 1413 (3d Cir. 1993).

includes a handwritten note by Smith that says "No Footings" and provides a $38,000 credit. Am. Compl. ¶¶ 117-123; Ex. 14 & 15.

Per Mega procedure, Smith then prepared and submitted a Project Information Sheet for the Rite Aid project. A Project Information Sheet is an internal Mega document that is supposed to include the entire scope of work and scheduled values for a particular project. The Project Information Sheet for the Rite Aid Project lists the value of the Rite Aid Project as $194,000, which reflects the prices listed in the Revised Bid, but omits the $38,000 for the CMU Wall footings. Am. Compl. ¶¶ 125-127; Ex. 16.

In August 2008, the first application for payment was submitted on behalf of Mega for payment on the Rite Aid project for the period from August 1, 2008, through August 31, 2008. Mega's payroll records, however, indicate that Mega began performing work on the Rite Aid project on July 7, 2008. According to the plaintiffs, Smith, on behalf of Paramount, submitted a payment application to Plumbline for work actually performed by Mega in July, specifically, $38,000 for the installation of footings at the Rite Aid Project. Paramount was eventually paid for the footings installation. Am. Compl. ¶¶ 128-132; Exs. 17-19.

On July 31, 2008, Smith submitted a change order request to Plumbline for additional work for $764. Smith never

entered this change order request in Mega's records and the plaintiffs believe that "Defendants received payment for such additional work and kept it for themselves." Am. Compl. ¶¶ 138-139; Ex. 21.

The first payment application included a $9,900 charge for a completed foundation drain. According to Mega, both Smith and Plumbline were aware that in fact the foundation drain was not complete at that time because in a fax dated September 19, 2008, from Plumbline to Mega, Matter outlines a time line for the project that states: "Foundation Drain Installed - 9/24/08." Mega believes that Smith submitted a fraudulent payment application for work that was not yet complete in order to "camouflage" the costs incurred by Mega on the Rite Aid Project, and that Smith was well aware that Mega's costs had far exceeded the amount requested in the payment application. Am. Compl. ¶¶ 133-136; Exs. 19 & 20.

On August 12, 2008, Smith submitted a proposal for additional work at the Rite Aid Project. The proposal involved removing and reinstalling granite curb for $19,260. By email dated August 14, 2008, Smith submitted a reduced proposal to Plumbline, stating that the curb work could be done for $15,750 if concrete were substituted for granite. In an email to Matter dated August 25, 2008, a "representative" of the owner of the Rite Aid Project questioned Plumbline about the $29,000 price

Mega was charging for the curb work, stating that similar curb replacement generally costs much less.[5]  Matter forwarded the email to Smith.  Am. Compl. ¶¶ 145-147; Exs. 23-25.

On August 25, 2008, Smith responded by email to Plumbline, outlining the various costs associated with the curb work.  The email states: "Total Cost - $29,402 (My Bid $15,750)."  A handwritten note on the email states "No Footings."  The plaintiffs believe that unspecified "defendants" kept the excess payments representing the difference between $29,000 and $15,750 for the curb work performed by Mega.[6]  Am. Compl. ¶¶ 148-149; Ex. 25.

On August 13, 2008, Uhrik sent an email to Smith requesting additional lumber and work from Mega for the Rite Aid Project.  Smith responded that Mega would deliver the lumber to the project site, which the plaintiffs believe it did.  Smith, however, did not enter a change order for the additional work and Mega never received any payment for it.  The plaintiffs believe that "either the owner was charged additional monies for the work

---

[5] Although the plaintiffs state in their complaint that "according to the owner's representative" the price Mega charged for the curb work was in excess of $29,000, the Court notes that the email attached as Exhibit 25 does not reveal how much the owners believed Mega was charging for the work.

[6] As in several parts of the complaint, the plaintiffs do not specify which defendants are alleged to have diverted and received the payments due to Mega.

and paid for the work, but the payment was diverted from Mega to and by Defendants, or the work was considered to be 'contract work' of others, but was performed by Mega and paid to Defendants."  Am. Compl. ¶¶ 140-142; Ex. 22.

On September 16, 2008, Mega was asked to perform additional clean-up work at the Rite Aid Project.  No change order request was created, but Mega performed the additional clean-up work and the plaintiffs believe that the owner paid for the work and that the payment was "diverted" by unspecified defendants.  The complaint also states that Mega employees performed certain work related to the grouting of beams at the Rite Aid Project, but that "Defendants caused payment for such labor to be diverted from Mega Construction to Defendants, contending that said work was performed by Defendants."  Am. Compl. ¶¶ 143-144, 150.

On September 16, 2008, Uhrik sent Smith an email inquiring into an invoice sent by Mega and asking Smith to adjust the price for the beam pockets and bearing plates because they had been reduced in number and "Plumbline did them in the field." Smith responded that he would need to create a deduct change order.  The plaintiffs contend that Smith actually knew that Mega had performed extensive work on the Rite Aid Project worth more than the beam pocket work being excluded from the payment application.  Am. Compl. ¶ 151; Ex. 26.

On September 18, 2008, one day after Mega terminated Smith, Mega contacted Plumbline and requested a copy of the Rite Aid Project subcontract.  The following day, Plumbline faxed Mega a copy of the Rite Aid subcontract and change orders.  The value of the contract was listed as $139,620, with various change orders attached.  Under "CMU footing excavation," the contract states "$38,000 first payment paid to Paramount Concrete Construction, Inc."  Paramount was apparently paid for the footings, although the plaintiffs allege that Mega actually performed the work.  Am. Compl. ¶ 153-154; Ex. 27.

The RICO Case Statement lists various predicate acts of mail and wire fraud committed by the Plumbline defendants, most of which allege that documents and payments related to the Rite Aid scheme, including bids, a certificate of insurance, and checks, were sent through the mail or wires.

### 4.  Barnes & Noble Project and Chesco Defendants

Chesco Coring & Cutting, Inc. ("Chesco") is a Pennsylvania corporation owned and controlled by Todd A. Cliggett.  These two defendants are together referred to as the "Chesco defendants."  Chesco had performed a substantial amount of work for Mega over the three years prior to the commencement of this action.  The plaintiffs assert that the scheme involving the Barnes & Noble project began in 2008 when Smith first

recruited the Chesco defendants to participate, but allege that Chesco has been involved in diverting money due to Mega through other unspecified projects over the years.  Am. Compl. ¶¶ 173, 175.

The Barnes & Noble Project, which was located near the Cherry Hill Mall in New Jersey, occurred at the same time as the Cherry Hill Mall Renovation Project.  Mega was not involved in the Barnes & Noble Project, but was involved in the mall renovation.  According to the complaint, Smith caused Mega to also perform work at the Barnes & Noble Project, but Mega was never compensated for this work.  Am. Compl. ¶ 176.

The general contractor for the Barnes & Noble Project was Dugan Building Company, Inc. ("Dugan").  On March 5, 2008, Smith, ostensibly on behalf of Mega, sent Cliggett an email that appears to be related to work to be performed by Chesco on the Barnes & Noble Project.  Two days later, Smith sent Dugan an email from a Paramount email address indicating that Paramount would be performing certain work at the Barnes & Noble Project for $8,725.  In an email dated March 25, 2008, from Smith - this time on behalf of Mega - to Chesco, Smith states: "We are on for Friday cut and remove at Cherry Hill Mall. Barnes and Noble."  On April 17, 2008, Paramount submitted a certificate of insurance to Dugan for the Barnes & Noble Project, naming Dugan and Barnes & Noble as insureds.  Am. Compl. ¶¶ 177-179, 185; Exs. 37-39 & 42.

Mega, however, has no knowledge or record of Chesco performing any work for it at the Barnes & Noble Project, or of any payment made to Chesco for work at that project. Mega's internal daily manpower schedules reflect that Mega performed work ostensibly for Chesco at the Barnes & Noble Project. According to the complaint, Smith scheduled Mega employees to perform work at the project and then indicated on the manpower schedule for that week that Chesco was the "customer." Am. Compl. ¶ 183; Ex. 41.

The plaintiffs assert that Smith used Chesco as a cover in order to conceal the fact that he was using Mega manpower and resources on the Barnes & Noble Project while Paramount was receiving payments for the work. At the time of the Barnes & Noble Project, Chesco was acting as a subcontractor for Mega on a project at the University of Pennsylvania known as the "Mod 7 Project." The plaintiffs believe that because Chesco's appearance in its manpower schedules would not raise any "red flags," Smith used Chesco's name to conceal the fact that he was using Mega employees and resources on the Barnes & Noble Project. The plaintiffs allege that Chesco doctored its business records and charged Mega for $4,000 of downtime on the Mod 7 Project when, in fact, Chesco had not incurred any such downtime. The plaintiffs allege that Chesco actually performed the $4,000 worth of work for Paramount at the Barnes & Noble Project. Am. Compl.

¶ 182; Exs. 40 & 44.

Smith also caused Mega to pay various invoices from JDM Material Company and CHS, Inc. for materials and services used on the Barnes & Noble Project. Smith sent an invoice to Dugan on April 1, 2008, which falsely represented that Paramount had performed work on the Barnes & Noble project. The plaintiffs allege that, in fact, only Mega and Chesco had performed work on the Barnes & Noble Project, and that Mega had paid for all such work. The complaint asserts that "Smith, Chesco, Paramount, and other Defendants divided Mega Construction's profits among themselves." Am. Compl. ¶¶ 186-187; Exs. 43 & 44.

The RICO Case Statement lists various predicate acts of mail and wire fraud committed by the Chesco defendants, most of which allege that documents and payments related to the Barnes & Noble scheme were sent through the mail or wires. The plaintiffs also assert that certain defendants involved in the Barnes & Noble scheme engaged in predicate acts violating the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

B.    Plaintiffs' Allegations

The plaintiffs bring twelve counts, ten of which involve the moving defendants. Count I alleges substantive violations of the civil RICO statute, 18 U.S.C. § 1962(c). The plaintiffs allege that all of the fourteen named defendants

formed one RICO association-in-fact "enterprise" and that they
each participated in the conduct of the enterprises's affairs
through a pattern of racketeering activity, specifically the
alleged predicate acts of mail and wire fraud, and transportation
and possession of converted property.  Count II alleges that the
defendants conspired to violate the civil RICO statute, in
violation of 18 U.S.C. § 1962(d).  Count IV alleges unfair
competition and false advertising under the Lanham Act, 15 U.S.C.
§ 1125.

II.  Analysis

        The Shoemaker defendants, Plumbline defendants, and
Chesco defendants all filed motions to dismiss all of the claims
against them for failure to state a claim.  The Court held oral
argument on the motions on March 9, 2011.

    A.  RICO Claims

        Count I of the plaintiffs' amended complaint alleges a
violation of 18 U.S.C. § 1962(c), which provides:


        It shall be unlawful for any person employed by or
        associated with any enterprise engaged in, or the activities
        of which affect, interstate or foreign commerce, to conduct
        or participate, directly or indirectly, in the conduct of
        such enterprise's affairs through a pattern of racketeering
        activity or collection of unlawful debt.

To state a claim for a violation of § 1962(c), a plaintiff must allege that each defendant: (1) conducted or participated in the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004).

### 1.   Existence of An Enterprise

The plaintiffs assert that all of the defendants formed an association-in-fact enterprise, with Smith at the helm. Throughout the life of the enterprise, Smith is alleged to have recruited different defendants to participate in the enterprise's various schemes, always with Smith coordinating and directing the activities of the other defendants.

A RICO enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  An association-in-fact enterprise must have a "structure," meaning it must have (1) a common purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose.  Boyle v. U.S., 129 S.Ct. 2237, 2244 (2009).  At the pleading stage, a RICO claim must plead facts plausibly implying the existence of an enterprise with these three structural attributes.  In re Ins.

Brokerage Antitrust Litig., 618 F.3d 300, 369-70 (3d Cir. 2010).
Cases involving RICO claims are often highly complex and lengthy,
and carry the possibility of both attorney's fees and treble
damages.  18 U.S.C. § 1964(c).  It is for this reason that the
United States Court of Appeals for the Third Circuit has
emphasized the importance of carefully examining the allegations
of the complaint at the pleading stage, lest the RICO statute
become "an open gateway to the imposition of potentially massive
costs on numerous defendants, regardless of whether there is even
a hint of the collaboration necessary to trigger liability."  In
re Ins. Brokerage, 618 F.3d at 370.

        The United States Supreme Court recently emphasized
that the concept of an association-in-fact is an expansive one
and refused to require any particular organizational arrangement.
Boyle, 129 S.Ct. at 2244-45.  The Supreme Court stated that
members of the association-in-fact "need not have a hierarchical
structure or a 'chain of command'; decisions may be made on an ad
hoc basis and by any number of methods," and while the "group
must function as a continuing unit and remain in existence long
enough to pursue a course of conduct, nothing in RICO exempts an
enterprise whose associates engage in spurts of activity
punctuated by periods of quiescence."  Id. at 2245.

        After Boyle, the Third Circuit decided In re Insurance
Brokerage, in which it upheld the dismissal of certain RICO

claims for failure to adequately allege the existence of an "enterprise." The In re Insurance Brokerage complaint alleged the existence of several hub-and-spokes "broker-centered" enterprises, comprised of each defendant-broker at the center or "hub" of the enterprise, and individual insurer-partners as the "spokes." The plaintiffs were insurance purchasers who alleged that the defendants had entered into an unlawful scheme to allocate purchasers among particular groups of insurers who were insulated from competition and that, in return, the insurers paid the brokers hidden commissions. The district court found that because the plaintiffs had failed to plead any collaboration among the insurer-partners, the alleged enterprise lacked a "unifying rim" connecting the various spokes. Id. at 374. As a result, the district court held that the plaintiffs had not pled broker-centered enterprises encompassing both the broker-hub and all of the insurer-spokes. Id.

The Third Circuit agreed, finding that the plaintiffs' factual allegations did not plausibly imply anything more than parallel conduct by the insurers and that nothing supported the inference that these insurers had associated together for the "common purpose of engaging in a course of conduct." Id. The "relationship" prong of the Boyle analysis for association-in-fact enterprises could not be met where the factual allegations of the complaint failed to show how several of the alleged

members of the enterprise were associated with one another.  The
allegations failed the basic requirement that "the components
function as a unit, that they be "put together to form a whole."
Id. (quoting Boyle, 129 S.Ct. at 2244) (quotations omitted).

As in In re Insurance Brokerage, the plaintiffs here
allege the existence of a hub-and-spokes type organization, with
Smith, Lawson and Paramount acting as the "hub," and the moving
defendants as the "spokes."  The complaint paints a picture of a
single set of common defendants perpetrating various independent
frauds, each with a different set of co-defendants who have no
relationship to one another.  The plaintiffs do not allege that
any of the moving defendants associated with each other in any
way, let alone for the common purpose of engaging in a course of
conduct.  There is nothing in either the amended complaint or the
RICO Case Statement that ties together the various defendants
into a single entity.  In short, the plaintiffs have failed to
plead facts plausibly implying the existence of relationships
between and among the members of the alleged enterprise, or that
the various members were joined in a common purpose, and
therefore has not plead the existence of an enterprise for the
purposes of a RICO claim.

In seeking to distinguish the Smith-centered enterprise
from other rimless hub-and-spokes organizations, the plaintiffs

point to the allegations regarding the "Marsh-centered" enterprise in In re Insurance Brokerage, which the Third Circuit found did plausibly imply the existence of an enterprise. The plaintiffs in In re Insurance Brokerage alleged that Marsh, a broker, prepared "broking plans" that governed the placement of insurance contracts. Each plan assigned the business to a specific insurer and included instructions as to which alternative insurer would provide a sham "competitive" quote. The Court found that the allegations in the complaint revealed "an expectation of reciprocity and cooperation among insurers," "relationships among the insurers," and that the various insurers in the enterprise had "joined together in pursuit of the aforementioned common purpose." Id. at 376.

The plaintiffs here fail to explain how the alleged Smith-centered enterprise is more like the Marsh-centered enterprise than the other broker-centered enterprises that the Third Circuit found deficient. In fact, the description of the Marsh-centered enterprise is an illustrative contrast to the allegations here. With respect to the former, the Court relied on the fact that the defendant-insurers provided sham bids in order to enable the other insurers in the scheme to obtain insurance contracts and expected the other insurers to do the same for them. As such, the allegations evinced "an expectation

of reciprocity and cooperation" among the insurers, i.e., a relationship among those associated with the enterprise. The allegations that the insurers knew about and collaborated with one another, even if by way of Marsh, was sufficient to plead that the insurers associated with one another for a common purpose.

By contrast, the amended complaint here does not allege that the moving defendants knew about or cooperated with one another in the way that the insurers in the Marsh-centered enterprise did. The Court is not saying that each member of the association-in-fact must engage in direct communication with each and every other member. The complaint must, however, set forth facts that plausibly imply the existence of some relationship among the various members of the enterprise. Although the term "relationship" is broad, it cannot be satisfied where the members were acting entirely independently. See Gregory P. Joseph, Civil RICO: A Definitive Guide 93 (3d ed. 2010).

The plaintiffs also point to Boyle, which involved a group of bank robbers who, over several years, stole night deposit boxes and attempted bank-vault burglaries. Boyle, 129 S.Ct. at 2241. The core group in Boyle was constant and others, like Boyle himself, were recruited from time to time. Id. Unlike the allegations in the instant complaint, however, the

"fluctuating individuals were aware of one another and, at the time each crime was committed, acting in concert with one another and with the core group." Joseph, supra at 106-107. There was "an agreement, on the part of all participants, core and fluctuating, to further a single purpose." Id. In other words, the arguably hub-and-spokes organization in Boyle possessed a unifying rim connecting the various members.

### 2. Conduct or Participate Element

In order to be liable under § 1962(c), a defendant must "conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Mere association with an enterprise does not violate § 1962(c). In order to "conduct or participate" in the conduct of an enterprise's affairs, a defendant must have "participated in the operation or management of the enterprise itself." Reves v. Ernst & Young, 507 U.S. 170, 179 (1993). An enterprise is "operated" not just by upper management, but also by "lower rung participants" who are under the direction of upper management. Id. at 184.

"Outsiders" to the enterprise may meet this requirement if they exert control over the enterprise, but outsider defendants must have "conducted or participated in the conduct of

the enterprise's affairs, not just their own affairs." Id. at
184-85. See also In re Ins. Brokerage, 618 F.3d at 380-81
("Similarly, we do not think a RICO violation occurs simply
because an enterprise provides goods or services that ultimately
benefit a defendant's racketeering efforts; in order to
constitute a § 1962(c) violation, it is necessary that the
defendant, in utilizing these goods or services, 'participate ...
in the conduct of [the] enterprise's affairs.'").

       Even assuming that the plaintiffs properly pled the
existence of an enterprise, the amended complaint fails to
adequately allege that any of the moving defendants participated
in the operation or management of that enterprise.[7]  Apart from
the complaint's vague and conclusory allegations of collaboration
and conspiracy, there are no facts to support a reasonable
inference that any of the moving defendants engaged in activities
constituting "participation" in the affairs of the enterprise, as
opposed to simply their own ostensibly legitimate business

_____

       [7] The Court notes that this analysis is somewhat complicated
by its conclusion that the plaintiffs have failed to plead the
existence of an enterprise, since a defendant cannot participate
in a non-existent enterprise.  See In re Ins. Brokerage, 618 F.3d
at 378 n.78.  Furthermore, a defendant's membership in a properly
pled enterprise would necessarily inform the analysis of whether
that defendant is alleged to have participated in the enterprise.
Nevertheless, the amended complaint is devoid of facts to support
a reasonable conclusion that the moving defendants participated
in the operation or management of any conceivable enterprise.

affairs.  Soliciting and accepting bids, issuing change orders, and negotiating contract terms and prices, are all activities consistent with the existence of a typical contracting relationship.  The plaintiffs have done nothing more than plead facts suggesting a business relationship between the moving defendants and Smith, and have failed to allege that the moving defendants were involved in directing the affairs of a RICO enterprise.  The fact that several of the moving defendants operated their own businesses is clearly insufficient to allege that they participated in the operation or management of the enterprise.

### 3.  Pattern of Racketeering

Finally, even assuming arguendo that the amended complaint adequately alleges both the existence of an enterprise and that the moving defendants conducted or participated in the conduct of the enterprise's affairs, the plaintiffs have failed to plead that either the Plumbline defendants or the Chesco defendants did so through a "pattern of racketeering activity."

In order to plead a pattern of racketeering, the complaint must allege that the defendant committed at least two acts of prohibited racketeering activity, and that those predicate acts are both related and amount to or pose a threat of

continued criminal activity.  18 U.S.C. § 1961(5); <u>H.J. Inc. v.</u>
<u>Northwestern Bell Tel. Co.</u>, 492 U.S. 229, 239 (1989).

Predicate acts are considered "related" if they have
the same or similar purposes, results, participants, victims or
methods of commission, or otherwise are interrelated by
distinguishing characteristics and not isolated events.  <u>Id.</u> at
239-40.

The "continuity" prong of the "pattern of racketeering"
requirement is both a "closed and open-ended concept, referring
either to a closed period of repeated conduct, or to past conduct
that by its nature projects into the future with a threat of
repetition."  <u>Id.</u> at 241.  Closed-ended continuity exists when
the series of predicate acts extends over a substantial period of
time.  <u>Id.</u> at 242.  Open-ended continuity might be present where,
even though the predicate acts are close in time, the acts
themselves pose a specific threat of indefinite repetition[8] or are
part of an ongoing entity's regular way of doing business.  <u>Id.</u>
at 242-43.  This continuity analysis is a fact-specific one, but
the Supreme Court has made clear that predicate acts extending

_____

[8]  An example of this type of open-ended continuity might be
if a defendant collects premiums from shop owners in a
neighborhood as "insurance" against someone looting their stores
and promises to return each month to collect the "premium" that
would ensure their continued protection.  <u>See</u> <u>H.J.</u>, 492 U.S. at
242.

over only a few weeks or months and threatening no future criminal activity do not satisfy this requirement.[9]  Id. at 242.

The alleged offenses involving the Plumbline defendants conceivably stretch from May 13, 2008,[10] to September 19, 2008, a total of about 4 months, which is insufficient to establish closed-ended continuity.[11]  See H.J., 492 U.S. at 242.  Nor have

---

[9]  Where the "pattern" element is difficult to determine, courts in the Third Circuit also focus on certain factors as they bear upon the questions of relatedness and continuity, including the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity.  See Tabas v. Tabas, 47 F.3d 1280, 1292, 1296 n.21 (3d Cir. 1995) (quoting Barticheck v. Fidelity Union Bank/First Nat'l State, 832 F.2d 36, 39 (3d Cir. 1987)).

[10]  The fact that the plaintiffs generally allege that the scheme involving the Plumbline defendants began in "early 2008" is plainly insufficient to state a predicate act or offense for the purposes of determining whether the complaint meets the continuity prong of the pattern requirement.  Furthermore, even assuming the scheme began in January 2008, the alleged wrongful conduct lasted less than a year, which is insufficient under Third Circuit case law to plead closed-ended continuity.  Tabas, 47 F.3d at 1293.

[11]  During oral argument, the plaintiffs pointed to the allegation in the RICO Case Statement that, on June 24, 2009, the Plumbline defendants sent Mega a check through the mail in an attempt to deceive them into accepting the payment, although a substantial amount was still owed for work performed by Mega. The plaintiffs contend that this letter would extend the life of the Rite Aid scheme to about 13 months.  By all accounts, however, the Rite Aid scheme ended in September 2008, when Smith's alleged fraud was discovered and he was terminated.  See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1418 (3d Cir. 1991) ("We must apply a "natural and common-sense approach to RICO's pattern element... Consequently, it should not be important that otherwise innocent mailings might continue long

the plaintiffs put forth any facts to suggest that the alleged predicate acts by the Plumbline defendants involve any threat of long-term criminal activity.  There is nothing about these acts that involves an inherent threat of repetition or any indication that the alleged offenses are a regular way of doing business for Plumbline.  See Banks v. Wolk, 918 F.2d 418, 424 (3d Cir. 1990) (finding that allegations of multiple fraudulent real estate schemes undertaken by the defendants demonstrated that fraud was their regular way of doing business).  Indeed, this is admittedly a single scheme involving one short-term project that would come to a natural end when the job was complete.  Nor can these predicates be attributed to a defendant who was "operating as part of a long-term association that exists for criminal purposes" because, as discussed above, the plaintiffs have failed to allege that the Plumbline defendants were part of such a long-term criminal association.  See H.J., 492 U.S. at 242-43.

Similarly, the alleged wrongful acts committed by the Chesco defendants stretch, at most, from March 2008 to June 2008, a period of no more than four months.  Closed-ended continuity has therefore not been alleged.  As with the Plumbline

_____

after the deceptive practices cease.") (quoting H.J., 492 U.S. at 237) (quotations omitted)).

defendants, the amended complaint is also devoid of facts to support a finding of open-ended continuity with respect to the Chesco defendants. There are no facts to suggest that the acts themselves carry any inherent threat of future repetition or that the alleged offenses are a regular way of doing business for Chesco. Simply put, even assuming that the plaintiffs have adequately alleged the other elements of their RICO claim, the complaint paints a picture of a defendant involved in a single, short-term scheme, not the sort of "long-term criminal conduct" with which Congress was concerned when it enacted the RICO statute. See H.J., 492 U.S. at 242.[12]

The plaintiffs argue that the pattern requirement as to the Plumbline and Chesco defendants can be satisfied by reference to all of the predicate acts committed throughout the life of the enterprise, whether or not that particular defendant was involved in those acts. The case law provides, however, that "no defendant can be liable under RICO unless he participated in two

---

[12] The Court notes that it is not deciding whether the plaintiffs have adequately alleged the predicate acts of racketeering activity. The Court simply finds that even if the alleged predicates were properly pled, the duration and nature of the alleged pattern would be insufficient to satisfy the continuity requirement. As it appears that the determination of whether the allegations against the Shoemaker defendants satisfy the continuity requirement would require analysis of factors beyond the purely temporal, the Court will refrain from engaging in an analysis of this issue with respect to Shoemaker.

or more predicate offenses sufficient to constitute a pattern."
Banks v. Wolk, 918 F.2d 418, 421 (3d Cir. 1990). The plain
language of § 1962(c) makes clear that it is the defendant who
must participate "through a pattern of racketeering activity."
See also id. at 421 (stating that only those allegations
involving a particular defendant in a RICO case could be
considered in determining whether a sufficient "pattern" had been
alleged against that defendant); In re Ins. Brokerage, 618 F.3d
at 371 ("As the plain language of the statute indicates, the
nexus element requires a plaintiff to show that the defendant
participated in the conduct of the enterprise's affairs...
through... a pattern of racketeering activity.").[13]

        With respect to the Chesco defendants, the plaintiffs
also assert that the Barnes & Noble Project is only "one example"
of the unspecified misconduct in which the Chesco defendants have
engaged over a three-year period. This vague and conclusory
allegation is plainly insufficient to adequately plead a
predicate act that can form the basis for a pattern of

_____

        [13] In making their argument to the contrary, the plaintiffs
cite to the Third Circuit's opinion in a criminal RICO case,
United State v. Eufrasio, 935 F.2d 553 (3d Cir. 1991). The
portion of the opinion to which the plaintiffs cite, however,
addresses only the "relatedness" element of the pattern
requirement. Id. at 564. Nothing in that opinion purports to do
away with the requirement that each RICO defendant must satisfy
the continuity element.

racketeering activity.

Finally, where the predicate acts alleged are mail and wire fraud, the allegations must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b).[14]  Lum, 361 F.3d at 223.  Rule 9(b) requires a plaintiff to plead fraud with sufficient particularity to apprise the defendants of the precise misconduct with which they are charged to protect them from spurious charges of fraudulent behavior.  Seville Industrial Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984).  Furthermore, where the plaintiff alleges mail or wire fraud, the complaint must "identify the purpose of the mailing within the defendant's fraudulent scheme."  Annulli v. Panikkar, 200 F.3d 189, 201 n.10 (3d Cir. 1999).

All of the moving defendants assert that the plaintiffs have failed to allege the predicate acts of mail and wire fraud with the specificity required under Rule 9(b).  Because the Court does not believe it is necessary to reach this issue given its resolution of the other elements of the RICO claim, it will refrain from deciding the question of whether the amended

---

[14] The mail fraud statute makes it a crime to mail or cause to be mailed something for the purpose of executing or attempting to execute any scheme or artifice to defraud.  The wire fraud statue makes it a crime to transmit or cause to be transmitted any communication by wire in interstate commerce for the purpose of executing or attempting to execute any scheme or artifice to defraud.  18 U.S.C. § 1341, 1343.

complaint adequately pleads mail and wire fraud.

    4.  Conspiracy Claims

    Count II of the amended complaint alleges that the
defendants conspired to violate the RICO statute, in violation of
18 U.S.C. § 1962(d).  To state a RICO conspiracy claim, the
plaintiffs must allege (1) an agreement to commit the predicate
acts, and (2) knowledge that those acts were part of a pattern of
racketeering activity conducted in such a way as to violate one
of the substantive provisions of the RICO statute.  Rose v.
Bartle, 871 F.2d 331, 366 (3d Cir. 1989).

    As the plaintiffs note, in certain circumstances, a
defendant may be held liable under § 1962(d) even where his or
her own actions would not amount to a substantive RICO violation.
Salinas v. United States, 522 U.S. 52, 65 (1997).  "But a §
1962(d) claim must be dismissed if the complaint does not
adequately allege 'an endeavor which, if completed, would satisfy
all of the elements of a substantive [RICO] offense.'"  In re
Ins. Brokerage, 618 F.3d at 373 (quoting Salinas, 522 U.S. at
65).

    Here, there are no facts to support a reasonable
inference that any of the moving defendants agreed with others to
commit any of the alleged predicate acts with the knowledge that

they were part of a pattern of racketeering activity conducted in such a way as to violate the RICO statute.  Furthermore, as described above, the plaintiffs have failed to allege an endeavor which, if completed, would satisfy all of the elements of a substantive RICO offense.  For these reasons, the plaintiffs' conspiracy claim also fails.

     B.   <u>Lanham Act Violations</u>

Count IV alleges violations of the Lanham Act, which creates a private cause of action for individuals harmed by the "deceptive and misleading use of marks," or "unfair competition."[15]  In order to state a claim for unfair competition,

---

[15] The Lanham Act provides that

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

a plaintiff must allege: (1) that the defendant used a false designation of origin; (2) that such use of a false designation of origin occurs in interstate commerce in connection with goods or services; (3) that such false designation is likely to cause confusion, mistake or deception as to the origin, sponsorship or approval of the plaintiff's goods and services by another person; and (4) that the plaintiff has been or is likely to be damaged. American Tel. and Tel. Co. v. Winback and Conserve Program, Inc., 42 F.3d 1421, 1428 (3d Cir. 1994).[16]

        In support of its unfair competition claim against the Shoemaker defendants, the plaintiffs argue that the allegations in the complaint are sufficient to "draw a reasonable inference" that the Shoemaker defendants passed off the plaintiffs' services as that of other defendants by submitting "deceptive payment

---

            shall be liable in a civil action by any person who
            believes that he or she is or is likely to be damaged
            by such act.

        15 U.S.C. § 1125(a).

        [16]   The Plumbline defendants challenge the assertion that the plaintiffs have alleged a violation of the unfair competition provision in their complaint.  Although Plumbline's confusion is understandable given that the complaint refers specifically to 15 U.S.C. § 1125(a)(1)(B), which is the "false advertising" provision of the statute, the Court finds that the plaintiffs have adequately alleged unfair competition.  The plaintiffs repeatedly allege in Count IV that the defendants' conduct constitutes unfair competition.

application documents" to the owner of the project that enabled Paramount and Shoemaker to be paid for work actually done by the plaintiffs.

With regard to the Plumbline defendants, the plaintiffs contend that it is "reasonable to infer" from the allegations in the amended complaint that the Plumbline defendants submitted documents to the owner of the Rite Aid Project and had Paramount paid for work performed by Mega, amounting to a false designation of origin.

Finally, the plaintiffs assert that it is also "reasonable to infer" that the Chesco defendants submitted documents to Paramount, which were in turn submitted to Dugan and the owner of the Barnes & Noble Project, which caused payments to issue to Paramount and Chesco for work actually performed by Chesco and Mega.

These conclusory and unsupported allegations are plainly insufficient to state a claim for unfair competition. The plaintiffs put forth no facts to support the conclusion that any of the moving defendants used any false designation of origin, relying instead on supposition and speculation. Even assuming that the plaintiffs could otherwise state a claim for unfair competition, the Court cannot make the numerous leaps the plaintiffs ask it to make in order to "infer" that the moving

defendants falsely designated the origin of either Mega's or another's services.

In order to state a claim for false advertising under § 1125(a)(1)(B), the plaintiff must allege that the defendant: (1) made false or misleading statements as to his own product [or another's]; (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decisions; (4) that the advertised goods traveled in interstate commerce; and (5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc. <u>Winback</u>, 42 F.3d at 1428 n.9.

Nowhere in the complaint do the plaintiffs allege that any of the moving defendants made any false or misleading statement about their own products or that of another. To the degree that the false advertising claim rests on the same allegations used to support the unfair competition claim, it fails for the same reasons.

For these reasons, the Court finds that the plaintiffs have failed to state any claim under the Lanham Act.


C.    <u>Leave to Amend</u>

In the event the court finds the amended complaint

deficient, the plaintiffs ask the Court to identify the areas of the complaint that are lacking and provide a reasonable time to amend the complaint a second time. Leave to amend should be freely given in the absence of undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies, undue prejudice to the opposing party, or futility of the amendment. Foman v. Davis, 371 U.S. 178, 182 (1962). The plaintiffs have already amended their complaint once and filed a RICO Case Statement. Despite an opportunity to amend their complaint, the plaintiffs' allegations still fall well short of what is required to state a claim either under RICO or the Lanham Act. Nor did the plaintiffs demonstrate during oral argument that they are able to cure the problems in their amended complaint. RICO actions are often prolonged and expensive, and the Court is unwilling to force the moving defendants to endure another round of pleadings where the plaintiffs have not offered the Court any reason to believe that an amended complaint would state a claim under either RICO or the Lanham Act. For these reasons, the Court finds that further amendment is not warranted under the circumstances.

III. Conclusion

For the foregoing reasons, the Court grants the motion

to dismiss the RICO claims (Counts I and II) and the Lanham Act claim (Count IV) against the moving defendants.  The Court will confer with the parties as to how they wish to deal with the state law claims against the moving defendants.

An appropriate order shall follow separately.