IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


MEGA CONCRETE, INC., et al.   :      CIVIL ACTION
                           :
      v.                 :
                           :
MICHAEL SMITH, et al.       :      NO. 09-4234


MEMORANDUM

McLaughlin, J.                        July 15, 2013

This lawsuit involves allegations that two former employees of the plaintiff construction companies, defendants Michael Smith and Kimberly Lawson, conspired and collaborated with others to steal the plaintiffs' resources, manpower, business opportunities, and payments owed on certain construction projects.  The plaintiffs, Mega Concrete, Inc., Mega Sitework, LLC, and Capponi Enterprises, Inc., originally filed suit against six individuals and six corporate entities in addition to Smith and Lawson.  The plaintiffs voluntarily dismissed their claims against two of the defendants, and the Court dismissed all claims against seven of the defendants.  Currently, five defendants remain in this suit.  They are Smith, Lawson, Paramount Concrete Construction, Inc. ("Paramount"), Jerry Frajdenberg, and U.S. Concrete, Inc. ("U.S. Concrete").

The second amended complaint ("SAC"), which is the operative pleading in this case, alleges claims against the remaining defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., as well as

various state law causes of action.  In addition, the plaintiffs

bring a claim against Smith for violation of the Lanham Act, 15

U.S.C. § 1125(a)(1)(A).

Lawson has not responded to any of the plaintiffs'

pleadings, and default has been entered against her.  Smith and

Paramount (together, and with Lawson, the "Smith Defendants")

have moved to dismiss the federal claims against them under Rule

12(b)(6) of the Federal Rules of Civil Procedure.[1]  Frajdenberg

and U.S. Concrete (together, the "U.S. Concrete Defendants") have

moved for judgment on the pleadings under Rule 12(c), also only

with respect to the plaintiffs' federal claims.[2]

After holding oral argument on the defendants' motions,

the Court will grant the U.S. Concrete Defendants' motion for

judgment on the pleadings and will grant in part and deny in part

the motion to dismiss filed by Smith and Paramount.

---

[1] Although styled as a motion for "Judgment on the Pleadings
and to Dismiss," Smith and Paramount have not filed a responsive
pleading to the SAC.  Their motion is, therefore, a motion to
dismiss.

[2] The U.S. Concrete Defendants have labeled their motion as
one to "dismiss" the claims pursuant to Rule 12(c).  Because they
have filed an answer to the SAC, the Court understands the motion
to be one for judgment on the pleadings.

I.  <u>Factual Allegations</u>[3]

The plaintiffs (collectively referred to in this opinion as "Mega") are Pennsylvania companies that conduct business under the trade name "MEGA Construction" or "MEGA Construction Company."  Mega specializes in cast-in-place concrete and site work, typically in a subcontractor capacity, throughout the Delaware Valley and elsewhere.  Mega identifies potential projects; prepares bids to the owner, general contractor, or construction manager overseeing the project; and negotiates the price of the contract and the scope of the work to be done.  Mega sometimes subcontracts portions of the work it has been awarded.  SAC ¶¶ 19-25.

Mega projects are recorded in an internal accounting system and assigned a job number to track the work performed, payments received or made, the amount of Mega's original

---

[3] The factual allegations underlying the plaintiffs' claims are drawn from the SAC, exhibits thereto also submitted by the plaintiffs, and matters of public record, which the Court may consider in deciding both a motion for judgment on the pleadings and a motion to dismiss.  <u>Huertas v. Galaxy Asset Mgmt.</u>, 641 F.3d 28, 31-32 (3d Cir. 2011) (per curiam); <u>Buck v. Hampton Twp. Sch. Dist.</u>, 452 F.3d 256, 260 (3d Cir. 2006).  The Court also considers the allegations contained in the plaintiffs' amended RICO case statement.  <u>See</u> <u>In re Ins. Brokerage Antitrust Litig.</u>, 618 F.3d 300, 310-11 (3d Cir. 2010); <u>Lorenz v. CSX Corp.</u>, 1 F.3d 1406, 1412 (3d Cir. 1993).  Because the U.S. Concrete Defendants' answer is composed almost exclusively of admissions or denials with few affirmative factual allegations of their own, the Court does not draw upon the assertions contained in that pleading in its consideration of the U.S. Concrete Defendants' motion for judgment on the pleadings.

contract, and "change orders," which modify the scope or price of work as set forth in the initial contract. Change orders may become necessary for a variety of reasons, including unexpected field conditions or the addition or deletion of new work, and are used on "[v]irtually every construction project." Other internal systems track the assignment of employees ("manpower schedules") and equipment to Mega projects. Id. ¶¶ 26-28, 38, 40.

Michael Smith began working for Mega in August 2004 as an estimator and project manager responsible for analyzing, bidding on, and managing projects. His duties gradually expanded and he became Mega's chief operating officer in January 2006. He was then responsible for preparing bids; negotiating contracts with project owners, general contractors, subcontractors and construction managers; and assigning employees and equipment to those projects. Smith was also responsible for submitting change orders when projects required additional work. Id. ¶¶ 34-37.

The plaintiffs assert that, beginning in 2005, Smith began a scheme to divert revenue, materials, equipment, and manpower from Mega in conjunction with Kimberly Lawson, his assistant and a Mega accounting clerk, who he "recruited" to aid him in his plans, and defendant Paramount, a company he controls. Id. ¶¶ 7, 10, 42-45. Paramount was incorporated on May 8, 2008, and Smith serves as the company's president. Smith Def'ts' Reply Ex. A (Paramount Bus. Entity Filing History). Prior to that

point, Smith and Paramount "used Paramount Concrete Construction, LLC as a trade-name." SAC ¶ 7.

Smith's scheme allegedly involved manipulation or concealment of work orders to increase the amount of work Mega performed on a given project without a corresponding entry in Mega's system. He and Lawson would alter books and records to conceal the use of Mega equipment and labor. This resulted in Mega employees performing work on projects for which Mega was not compensated. Smith also allegedly used his managerial position at Mega to divert business opportunities to the Paramount entities he controlled. The plaintiffs allege that Smith's scheme lasted from January 2005 through September 17, 2008, when he was terminated by Mega, and for an unspecified period thereafter. Id. ¶¶ 47-69.

A.    Locust Towers Project

Mega alleges that, in connection with a construction project to convert a Philadelphia office building into residential condominiums ("Locust Towers Project"), Smith, "through [the] help of others, including Defendant Lawson," solicited the project's general contractor, Shoemaker Construction Co. ("Shoemaker"), to participate in his "overall

scheme."[4]  Id. ¶¶ 70-71.

In early 2006, Shoemaker became the general contractor on the Locust Towers Project.  Smith, on behalf of Mega, submitted a bid to do cast-in-place concrete work for the project, which Shoemaker accepted.  Mega began performing its concrete work in the fall of 2006, and signed a written subcontract with Shoemaker on January 30, 2007.  The subcontract was for $196,330, subject to additions and deletions by change order.  Shoemaker sought additional work on the project not covered by Mega's subcontract.  Mega submitted various change order requests to take on these new tasks.  Some of Mega's proposals were approved by Shoemaker "but for a substantially lower dollar value than what was initially proposed."  Each change order approval, which is signed by both Shoemaker and a representative of Mega, was transmitted through the mails, and invoices of the relevant approved change orders are appended to the SAC as exhibits.  Id. ¶¶ 72-77, 79-80 & n.2; PX 1 (3/24/06 Subcontract Agmt.).[5]

_____

[4] Shoemaker and its principal, Roger Ball, are former defendants in this suit.  They were dismissed from the case on April 4, 2011.  4/4/11 Order (Docket No. 71).

[5] "PX" refers to the exhibits submitted by the plaintiffs along with their first amended complaint.  The plaintiffs did not resubmit exhibits when they filed their SAC; however, as the exhibit numbering is the same in both pleadings, it is the Court's understanding that the exhibits submitted along with the first amended complaint are also included by reference in the SAC.

Smith and Shoemaker, through its principal, Roger Ball, devised a method for using these change orders to divert payments owed to Mega. In one instance, Smith submitted a proposal for Mega to perform hole patching and infill work at a price of $125 per hole, which Shoemaker and the property owner approved. At the time, Smith and Shoemaker knew that Shoemaker did not intend to pay for this extra work. Between October 2006 and February 2007, Mega patched 1,629 holes on the Locust Towers Project, work that should have been valued at $203,625. Smith, however, failed to invoice Shoemaker for this hole patching work so that Mega could be paid. SAC ¶¶ 78, 81; Am. RICO Case Stmt. at 38-39, 42.

In July 2008, other Mega employees found work orders for Mega's patching/infill work that Smith had never submitted for payment. Mega immediately sent to Shoemaker a change order request for $203,625. Shoemaker approved a change order for only $34,250, although it never paid Mega for any of this infill work. Lawson, at Smith's direction, forged the signature of a Mega executive on the form indicating acceptance of this $34,250 revisal. Mega alleges that Smith, with the assistance of Lawson and Ball, diverted "as a skim for themselves" the value of the non-invoiced patching and infill work. SAC ¶ 82; PX 3 (7/15/08 Mega Change Order Request); PX 2 (8/19/08 Shoemaker Subcontract

---

Although dated March 24, 2006, the subcontract between Mega and Shoemaker was signed by their representatives on January 29, 2007 and January 30, 2007, respectively. PX 1 at 1.

Change Order # 6); Am. RICO Case Stmt. at 42.

On May 10, 2007, Shoemaker entered into a second subcontract with Mega to perform slab repair work on the project for the nominal price of $0, subject to additions and deletions. Shoemaker approved three change orders, encompassing six tasks, for a total of $99,478. In connection with one task, Mega performed $164,592 of additional work approved by Shoemaker. Although the property owner paid Shoemaker for all of this work, Smith and Shoemaker agreed to issue to Mega a false change order approval for only $89,498. Mega alleges that "Smith, Ball, Shoemaker, and Paramount, with the assistance of Lawson," diverted and kept the difference between what the property owner paid and what was transmitted to Mega: more than $75,000. SAC ¶¶ 84-87; Am. RICO Case Stmt. at 40-41; PX 4 (4/6/07 Subcontractor Agmt.); PX 5 (Subcontract Change Orders).

In total, Mega alleges that it performed $629,744 worth of work on the Locust Towers Project but was paid only $315,480, because the remainder was diverted by the Smith Defendants and Shoemaker "to be split among themselves." SAC ¶¶ 89-90. When Shoemaker diverted these payments to the Smith Defendants, it did so through the mail. Am. RICO Case Stmt. at 41.

B.  Rondo-Pak Project

In February 2008, Smith solicited a project at a

printing press foundation owned by Rondo-Pak, Inc. ("Rondo-Pak")
in Norristown, Pennsylvania ("Rondo-Pak Project"). Mega asserts
that, although Smith was nominally soliciting the business on
Mega's behalf, he intended to take the project for himself,
Paramount, and two other non-parties, Chesco Coring & Cutting,
Inc. ("Chesco") and its treasurer, Todd Cliggett.[6] Smith
reviewed press drawings at Rondo-Pak and, after an on-site
meeting, forwarded those drawings to Robert R. Rosen Associates
("Rosen"), an engineering firm with whom Mega had worked, to
commission a design. Rosen mailed an invoice to Mega for $1,000
on April 1, 2008, which Lawson "intercepted and stole" and
redirected to Smith, asking in an e-mail, whether the invoice was
his. Smith paid Rosen's bill in full from an account held by the
Paramount entity Paramount Concrete Construction, LLC. SAC
¶¶ 137-41; PX 29 (4/1/08 E-mail from K. Lawson to M. Smith);
PX 30 (Check No. 1002).

On February 22, 2008, Smith and Lawson submitted
through the mail a bid for the Rondo-Pak Project on Mega
stationery, which Rondo-Pak accepted. Smith, with Lawson's
assistance, used resources from Mega and Chesco to complete the
work on the project. On March 17, 2008, in an e-mail sent from
Smith's Mega account, Smith told Rondo-Pak to direct payment for

---

[6] Both Chesco and Cliggett were defendants in this suit, and
were dismissed from the case on April 4, 2011. 4/4/11 Order
(Docket No. 71).

-9-

the job "to another firm that we work very closely with on a daily basis" and to which Mega had subcontracted the work. Smith then sent Rondo-Pak a $26,450 invoice on Paramount Concrete Construction, LLC stationery. On April 17, 2008, Rondo-Pak issued a check to Paramount Concrete Construction, LLC in Pennsylvania, which was deposited in a New Jersey bank account. SAC ¶¶ 142-48, 151; Am. RICO Case Stmt. at 23, 47; PX 33 (3/21/08 E-mail from M. Smith); PX 36 (Check No. 272).

　　　　C.　Barnes & Noble Project

　　　　In March 2008, Smith, with Lawson's help, solicited Chesco to assist them in diverting another business opportunity from Mega to Smith's side business. The next month, Smith and Lawson, without the knowledge of anyone else at Mega, caused Mega to perform work and provide materials used at a construction site for a Barnes & Noble bookstore in Cherry Hill, New Jersey ("Barnes & Noble Project"). Meanwhile, Smith represented to the project's general manager that Paramount Concrete Construction, LLC would be the entity doing the work on the project. In a March 7, 2008 e-mail, Smith told the general contractor that Paramount Concrete Construction, LLC's work on the project would cost $8,725. Later that month, Smith sent an e-mail to Chesco from his Mega account, stating that they were "on" to perform work at the site. SAC ¶¶ 152-58, 162; PX 38 (3/7/08 E-mail from

-10-

M. Smith); PX 39 (3/25/08 E-mail from M. Smith).

Mega asserts that Smith "attempted to cover up the diversion" of the project to his Paramount business by having Chesco, who was performing subcontractor work for Mega on a separate project at the University of Pennsylvania, include line items in its Penn project invoices for work that was actually done at the Barnes & Noble site. Mega's "manpower schedule" does show that Mega performed work at the Barnes & Noble work site, with Chesco as the listed customer, although Mega lacks any invoices to Chesco for the labor it provided or payments from Chesco for work on the project. SAC ¶¶ 159-61.

In furtherance of this scheme, Smith submitted to the project's general contractor, through mail or interstate wire, a "forged certificate of insurance" naming Barnes & Noble and the general contractor as insurers and Paramount Concrete Construction, LLC as the insured, even though Mega supplied and paid for the labor and materials used on the project. "Smith, Lawson, and/or Paramount" then had Mega pay invoices to various third parties who provided materials and services on the Barnes & Noble Project but purportedly employed on Mega's nearby construction site at a Cherry Hill mall. Smith also mailed the general contractor an invoice for work allegedly performed by Paramount Concrete Construction, LLC but that was actually done by Mega. Finally, Smith, with Lawson's assistance, caused Mega

to issue a check to Chesco for its work on the project.  The
profits of the Barnes & Noble Project are alleged to have been
split among Paramount, Lawson, Smith, and Chesco.  Id. ¶¶ 163-65;
Am. RICO Case Stmt. at 49-51; PX 42 (4/17/08 Cert. of Liab.
Ins.); PX 43 (Invoices).


    D.   Rite Aid Project

       Beginning in early 2008, a Pennsylvania company named
Plumbline Construction, Inc. ("Plumbline") was the general
contractor or construction manager on a project to renovate a
Rite Aid pharmacy at Tenth and Market Streets in Philadelphia
("Rite Aid Project").[7]  Around the same time, Smith and Lawson
solicited Plumbline to assist them in using the project as a
means of taking funds from Mega.  The Smith Defendants,
Plumbline, and its principals agreed that, if Mega were selected
to perform subcontracting work on the Rite Aid Project, they
would divert Mega's manpower, material, and duly owed payments.
SAC ¶¶ 12, 92, 94-95; Am. RICO Case Stmt. at 4.

       On May 13, 2008, Smith, on behalf of Mega, e-mailed a
quote of $324,416[8] to Plumbline for certain work on that project,

---

   [7] Plumbline and its two principals, John Matter and Andrew
Uhrik, were formerly defendants in this suit.  They were
dismissed from the case on April 4, 2011.  4/4/11 Order (Docket
No. 71).

   [8] The SAC alleges that the bid Smith e-mailed to Plumbline
was for $324,375.  The e-mail, which is attached as an exhibit,
quotes Mega's "BASE BID" as $324,416.  Compare SAC ¶¶ 97-98, with

including the installation of footings.  In late May or early June 2008, the project manager of the Rite Aid Project, an entity named APP Corporation ("APP"), approved allocation of $260,000 for the concrete work, whereupon Plumbline accepted Mega's bid. SAC ¶¶ 96-99; PX 14.

After Mega began to perform work on the Rite Aid Project, on July 9, 2008, Smith e-mailed to Plumbline a revised bid in the amount of $232,000.  Mega asserts that the revised bid was unauthorized, and that $28,000, the difference between the amount approved by APP and Smith's revised bid, was diverted by the Smith Defendants and Plumbline.  In addition, Smith made a handwritten note on the revised bid that stated "No Footings" and provided a $38,000 credit.  Smith then prepared a "Project Information Sheet" for internal use by Mega.  It reflects the unauthorized $28,000 reduction from the revised bid and also omits the $38,000 in footing work, for a total contract amount of $194,000 reported to Mega.  SAC ¶¶ 100-05; PX 15 (7/9/08 E-mail from M. Smith to A. Uhrik); PX 16 (Mega Project Info. Sheet #2).

On July 17, 2008, Smith sent Plumbline an invoice from his Paramount e-mail address for the $38,000 in footing work originally bid on by Mega.  Eventually, Plumbline paid Paramount $34,200 for this work, sending a check through the mail in July

---

PX 14 (5/13/08 E-mail from M. Smith to J. Matter).

2008,[9] which Smith deposited in a New Jersey bank account. Mega alleges that its workers actually performed the footing installation and that it was owed the $38,000. To "camouflage the costs incurred" by Mega in performing this footing project during July, Smith included in the payment application submitted to Plumbline on Mega's behalf line items for work that had not yet been completed. SAC ¶¶ 108-13; Am. RICO Case Stmt. at 44; PX 18 (Mega Payroll Record); PX 17 (Application for Payment).

Mega also alleges that it provided additional work and materials on the Rite Aid Project, as requested by APP or Plumbline, that were not recorded by Smith in Mega's system as change order requests or approvals. This includes sidewalk replacement work totaling $22,109. Mega alleges that, when the property owner paid for this work, Plumbline and/or the Smith Defendants kept it for themselves. SAC ¶¶ 116-21.

In August, Smith submitted by e-mail a proposal to remove and reinstall a granite curb for $19,260, which he then revised to $15,750, provided that the curb was made of concrete. When questioned by APP about a $29,000 quote for the job, the source of which is unclear, Smith "outlined the basis for the $29,000 pricing but reminded Plumbline that his bid on 'behalf

---

[9] The plaintiffs' RICO case statement asserts that Plumbline sent this check on "July 18, 2012." Am. RICO Case Stmt. at 44. Given that the case statement was filed in May 2012, before the alleged transmittal date, and that the other events discussed in this section of the case statement all took place in July 2008, this date appears to be a typographical error.

of' [Mega] was actually $15,750." Mega asserts that the Smith Defendants and/or Plumbline received $29,000 for the curb repair work, paid Mega the $15,750 that had been invoiced, and pocketed the difference. Mega also alleges that the Smith Defendants defrauded the plaintiffs by causing the owner of the Rite Aid property to pay them or Plumbline for work purportedly done by other companies but actually performed by Mega. The Smith Defendants and Plumbline received their payments from the property owner through the mails. Id. ¶¶ 122-29.

On September 18, 2008, a day after it fired Smith, Mega requested a copy of its subcontract with Plumbline. The document Plumbline sent in response was for work totaling $139,620, which was less than the $260,000 originally approved by APP, and included Paramount as the payee on some of the work that had been performed. After consulting with Smith, in November, Plumbline submitted through the mail false subcontract change orders to conceal the work done by, but not paid to, Mega. Id. ¶¶ 131-34; PX 27 (9/19/08 Facsimile); Am. RICO Case Stmt. at 45-46.

E.    Projects Involving U.S. Concrete

No later than early 2006, Smith "solicited and recruited" U.S. Concrete, a New Jersey company, through its principal, Jerry Frajdenberg, to work together on two construction projects. According to Mega, U.S. Concrete agreed

to engage Mega to perform "laser screed" concrete work at two New Jersey construction sites.[10]  As part of the agreed upon endeavor, Smith and Lawson would then issue false invoices for amounts substantially less than the value of the work performed on the projects.  Am. RICO Case Stmt. at 5-6, 15; SAC ¶¶ 8, 166-67.

On March 25, 2006, Smith and Lawson prepared an invoice for $7,860 in connection with Mega's project at a Bed, Bath and Beyond store in Cherry Hill, and, on April 10, 2006, they issued an invoice for $2,933.94 on behalf of Capponi Enterprises in connection with a project at DeSimone BMW in Mount Laurel, New Jersey.  Both invoices underbilled U.S. Concrete for the work performed.  Frajdenberg, on behalf of U.S. Concrete, paid the former bill in full, although U.S. Concrete paid only a portion of the latter bill.  Both payments were made in May 2006.  The invoices and U.S. Concrete's payment checks were all transmitted through the mail.  With respect to both projects, U.S. Concrete knew that Mega had performed more work than was invoiced.  Am. RICO Case Stmt. at 16-17; SAC ¶¶ 169-72.

More than sixteen months later, on various dates between October 8 and October 31, 2007, U.S. Concrete rented a laser screed belonging to Mega.  Smith, without authorization

---

[10] The parties have not described laser screed work.  From the context offered by their pleadings and briefing, it appears to be a method of leveling concrete floors.

from Mega, agreed with Frajdenberg "to cap the daily price of the laser screed work performed by Plaintiffs at $2,000," despite the fact that Mega's pricing policy, to which U.S. Concrete had previously agreed, contained no such cap. Mega asserts that U.S. Concrete owes it $19,808, representing rental fees that would have been incurred if not for the unauthorized agreement to cap daily charges. Smith and Lawson initially issued an invoice to U.S. Concrete on October 31, 2007 for $16,467.30, which Mega asserts also represented a "deliberate failure to bill for labor time and overtime." Others at Mega revised that invoice to $23,212.58, providing the amended invoice to U.S. Concrete also on October 31. SAC ¶¶ 177-81; PX 46 (10/31/07 Invoice).

After receiving the revised October bill and in consultation with Smith, U.S. Concrete falsely asserted that Mega's equipment had malfunctioned, requiring remedial work. Mega disputed the underlying problem necessitating remedial work, although it could not rule out the possibility that its laser screed had malfunctioned. U.S. Concrete refused to pay Mega for the rental of the laser screed. Roughly one year later, on September 19, 2008, Frajdenberg sent a letter to Mega issuing back charges in the amount of $20,789.40 for remedial work. Mega, upon sending two representatives to investigate, concluded that U.S. Concrete's demand was false and that it never performed any remedial work. SAC ¶¶ 182-97; Am. RICO Case Stmt. at 8.

II.  <u>Analysis</u>

        The motions presently before the Court deal only with
Mega's federal claims.  Mega contends that the five defendants in
this suit formed two RICO association-in-fact enterprises: one
comprised of the Smith Defendants and encompassing the diversion
of resources, money, and business opportunities from the
plaintiffs in connection with the Locust Towers, Rondo-Pak,
Barnes & Noble, and Rite Aid Projects (the "Smith Enterprise");
and one comprised of Smith, Lawson, and the U.S. Concrete
Defendants, involving conversion of Mega's equipment, labor, and
material at three construction projects in New Jersey (the "U.S.
Concrete Enterprise").  Am. RICO Case Stmt. at 2; Pls.' Opp. to
Smith Def'ts' Mot. to Dismiss at 6.  Although in the SAC and the
amended RICO case statement Mega asserts that Paramount was part
of the U.S. Concrete Enterprise, at oral argument, plaintiffs'
counsel conceded that Paramount was not involved in this second
enterprise.  10/12/12 Hr'g Tr. at 4.

        Mega alleges that, through the respective enterprises,
each participant committed a substantive RICO violation under 18
U.S.C. § 1962(c), and that each group of enterprise participants
conspired to violate the RICO statute, itself an independent
violation of 18 U.S.C. § 1962(d).  The substantive RICO and RICO
conspiracy claims relating to the Smith Enterprise form the basis
of Counts I and II of the SAC, and the RICO claims pertaining to

the U.S. Concrete Enterprise are pled in Counts III and IV.
Count V is a Lanham Act claim against Smith, alleging that he
falsely designated services as provided by Paramount when in fact
they were provided by Mega.

The motion to dismiss filed by Smith and Paramount and
the motion for judgment on the pleadings filed by the U.S.
Concrete Defendants argue that Mega fails to state a claim under
RICO or the Lanham Act.  Both motions, are, therefore, analyzed
using the same standard.  Revell v. Port Auth., 598 F.3d 128, 134
(3d Cir. 2010).

In ruling on the defendants' motions, the Court must
accept as true all well-pleaded factual allegations in the SAC
and amended RICO case statement and draw all reasonable
inferences in favor of the non-moving plaintiffs, although it
need not accept legal conclusions, including those couched as
factual assertions.  Huertas, 641 F.3d at 32; Fowler v. UPMC
Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  The complaint
must contain enough facts, when taken as true, "to state a claim
to relief that is plausible on its face."  Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 570 (2007).  Plausible entitlement to
relief must rise "above the speculative level," but may exist
even if it strikes the Court that actual proof of the facts
alleged is "improbable."  Id. at 555-56 & n.3; see also Ashcroft
v. Iqbal, 556 U.S. 662, 696 (2009).

With this standard in mind, the Court finds that Mega has adequately pled both a substantive RICO claim and a RICO conspiracy claim against Smith and Paramount with respect to their involvement in the Smith Enterprise, and will, therefore, deny their motion to dismiss Counts I and II of the SAC. The Court will also deny the motion to dismiss the Lanham Act claim in Count V. The Court finds, however, that Mega has failed to plead sufficiently RICO violations with respect to any of the moving defendants' participation in the U.S. Concrete Enterprise. Accordingly, the Court will dismiss with prejudice Counts III and IV against Smith and Paramount, and will grant the U.S. Concrete Defendants' motion for judgment on the pleadings on those same counts.

A.    <u>Substantive RICO Claims</u>

Counts I and III of the SAC, which apply to the Smith Enterprise and the U.S. Concrete Enterprise, respectively, assert a violation of 18 U.S.C. § 1962(c). That section of the RICO statute provides as follows:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

To state a claim for a violation of § 1962(c), a plaintiff must allege that each defendant: (1) conducted or participated in the

conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004).

### 1. Law of the Case

As a preliminary matter, all of the moving defendants argue that Mega's RICO claims against them must fail based on the doctrine of law of the case. That doctrine holds that "'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" Feesers, Inc. v. Michael Foods, Inc., 591 F.3d 191, 207 (3d Cir. 2010) (quoting Arizona v. California, 460 U.S. 605, 618 (1983)).

To make their argument, the defendants invoke this Court's prior decision of March 24, 2011. In that decision, the Court granted motions to dismiss filed by seven above-referenced third parties, Shoemaker, Ball, Plumbline and its two principals, Chesco, and Cliggett, who, along with the five defendants remaining in this case, were named in the first amended complaint as participants in a single association-in-fact RICO enterprise. See Mega Concrete, Inc. v. Smith, No. 09-4234, 2011 WL 1103831, at *1, 7 (E.D. Pa. Mar. 24, 2011). The Court determined that no enterprise among all of these defendants had plausibly been pled. Rather, the allegations of Mega's former pleading demonstrated,

at best, that Smith, Lawson, and Paramount combined on individual projects with differing clusters of then-defendants to steal money and resources from Mega.  The structure resembled a hub-and-spoke system, with the Smith Defendants at the hub, but no connective rim linking the discrete sets of moving defendants in a single scheme.  Id. at *8-10.  Nor could the Court conclude that those moving defendants had conducted the affairs of an enterprise as opposed to their own business pursuits.  Id. at *10.  Following that decision, Mega amended its complaint.

The Court's 2011 decision has limited preclusive effect at this stage.  Contrary to the defendants' argument, the claims in the first and second amended complaints are not "essentially the same."  See U.S. Concrete Def'ts' Br. at 8.  The allegations of the SAC underpinning Mega's present RICO claims differ markedly from those contained in Mega's prior complaint.  Instead of one vast enterprise among all of the current defendants and those who were previously dismissed, the SAC alleges two separate RICO enterprises respectively comprised of the Smith Defendants and Smith, Lawson, and the U.S. Concrete Defendants.  Although its analysis of the law of RICO is largely unchanged since issuing its 2011 decision, the Court has not before passed on the sufficiency of RICO claims based on the new, smaller-scale enterprises under those legal standards.  Law of the case has no force with respect to such "issues that were never discussed in

the prior opinion." <u>Feesers</u>, 591 F.3d at 208.

    2.  <u>General RICO Standards</u>

       Both sets of moving defendants also argue that Mega's present allegations are substantively deficient. They contend that, with respect to both the Smith and U.S. Concrete Enterprises, Mega has failed to plead adequately the existence of an enterprise or a pattern of racketeering activity. The Court discusses these required elements in turn.

    a.  <u>Enterprise</u>

       Association-in-fact RICO enterprises, as are alleged here, are defined as "any . . . group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has emphasized that the concept of an association in fact is an expansive one. <u>Boyle v. United States</u>, 556 U.S. 938, 945-47 (2009). Ultimately, it is defined as a "group of persons associated together for a common purpose of engaging in a course of conduct." <u>United States v. Turkette</u>, 452 U.S. 576, 583 (1981). Such an enterprise must have a "structure," meaning it must have (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. <u>Boyle</u>, 556 U.S. at 946.

In Boyle, the Supreme Court explicitly refused to require any particular type of organizational system to establish an association-in-fact enterprise. Id. at 948-49. The Court stated that members of the association "need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods," and, although the "group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence." Id. at 948. As the Court of Appeals for the Third Circuit has since clarified: "Boyle makes clear, in other words, that although the structure requirement demands that 'the parts' of the association in fact must be 'arranged or put together to form a whole,' the statute does not prescribe any particular arrangement, as long as it is 'sufficient to permit [the enterprise's] associates to pursue the enterprise's purpose.'" In re Ins. Brokerage, 618 F.3d at 367 (quoting Boyle, 556 U.S. at 945-46) (alteration in the original).

It bears noting that, although the evidence used to prove a pattern of racketeering activity and the evidence establishing an enterprise "may in particular cases coalesce," the existence of an enterprise is still a separate element that must be proved. Boyle, 556 U.S. at 947 (quotation marks and

citation omitted).

        b.   Pattern of Racketeering Activity

        To be liable under § 1962(c), a defendant must "conduct
or participate, directly or indirectly, in the conduct of [the]
enterprise's affairs through a pattern of racketeering activity."

        In order to plead a pattern of racketeering activity,
the complaint must allege that the defendant committed at least
two acts of prohibited racketeering, and that those predicate
acts are both related and amount to or pose a threat of continued
criminal activity.  18 U.S.C. § 1961(5); H.J. Inc. v. Nw. Bell
Tel. Co., 492 U.S. 229, 239 (1989); United States v. Bergrin, 650
F.3d 257, 267 (3d Cir. 2011).  Predicate acts are related when
they have the same or similar purposes, results, participants,
victims or methods of commission, or otherwise are interrelated
by distinguishing characteristics and not isolated events.  H.J.
Inc., 492 U.S. at 239-40.  The "continuity" prong of the "pattern
of racketeering" requirement is both a "closed- and open-ended
concept, referring either to a closed period of repeated conduct,
or to past conduct that by its nature projects into the future
with a threat of repetition."  Id. at 241.  The analysis is a
fact-specific one, but predicate acts extending over a few weeks
or months and threatening no future criminal conduct do not
satisfy this requirement.  Id. at 242; United States v. Pellullo,

964 F.2d 193, 209-10 (3d Cir. 1992).

Mega alleges that the predicate acts constituting the pattern of racketeering for both the Smith and U.S. Concrete Enterprises are mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.  Mega further contends that the activities of each enterprise also involved interstate transportation and possession of stolen property in violation of 18 U.S.C. §§ 2314-2315.[11]  Am. RICO Case Stmt. at 36-37.

The elements of mail and wire fraud are (1) a scheme or artifice to defraud; (2) participation in that scheme with the specific intent to defraud; and (3) the use of the mail or interstate wire transmissions, depending on the fraudulent conduct alleged, in furtherance of that scheme.  Nat'l Sec. Sys., Inc. v. Iola, 700 F.3d 65, 105 (3d Cir. 2012); United States v. Hedaithy, 392 F.3d 580, 590 (3d Cir. 2004).  A "scheme or artifice to defraud . . . must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension."  Lum, 361 F.3d

_____

[11] In pertinent part, § 2314 makes it a crime to transport, transmit, or transfer in interstate or foreign commerce any goods, wares, merchandise, securities, or money, of the value of $5,000 or more, knowing the same to have been stolen, converted, or taken by fraud.  Section 2315 similarly prohibits receipt, possession, concealment, storage, sale, barter, or disposition of any goods, wares, merchandise, or money, of the value of $5,000 or more, which have crossed a state or United States boundary after being stolen, unlawfully converted, or taken, and where the receiving individual knows the same to have been stolen, converted, or taken.

at 223 (quotation marks and citation omitted).  To constitute
mail or wire fraud, the contents of the communications need not
be fraudulent or an "essential element" of the scheme, but they
must be related to the underlying fraudulent scheme.  Schmuck v.
United States, 489 U.S. 705, 710-15 (1989); see also Kehr
Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1415 (3d Cir.
1991).

Allegations of mail and wire fraud must meet the
heightened pleading standard of Federal Rule of Civil Procedure
9(b).  Lum, 361 F.3d at 223.  Rule 9(b) requires a plaintiff to
plead fraud with sufficient particularity to apprise the
defendants of the precise misconduct with which they are charged.
Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d
786, 791 (3d Cir. 1984).  Plaintiffs may satisfy this requirement
by pleading the date, time, and place of the fraud, or by
alternative means of injecting some measure of substantiation
into their allegations.  Id.  Plaintiffs also must allege who
made a misrepresentation to whom and the general content of the
misrepresentation.  Lum, 361 F.3d at 224.

Predicate acts based on violations of other statutes,
such as the Stolen Property Act, need not be pled with
particularity, except where the complaint alleges that the
property was taken by fraud.  See Seville, 742 F.2d at 791.  Even
then, only the "circumstances" of the fraud must be pled with

particularity.  <u>Id.</u> (quotation marks omitted).


   3.   <u>Smith Enterprise</u>

   The Court concludes that, with respect to the Smith
Enterprise, Mega has sufficiently pled both the existence of an
enterprise and a pattern of racketeering activity on the part of
Smith and Paramount.


   a.   <u>Enterprise</u>

   Smith and Paramount argue that Mega fails to establish
collaboration among Smith, Paramount, and Lawson rising to the
level of an association in fact.  They assert that the
allegations regarding Lawson are all too conclusory to
demonstrate her shared purpose and involvement in a common scheme
with Smith and his company.  They also argue that Smith and
Paramount are indistinguishable, given that Smith is Paramount's
sole owner and president, and cannot be considered separate
members of a single enterprise.  In essence, they contend that,
to the extent Mega has stated a claim, it is for state law
business torts against Smith, and Smith alone.

   The Smith Defendants are correct that the allegations
against Lawson are limited and lacking in some fine-grained
detail.  Nevertheless, the Court finds that they are sufficient,
though just barely, to plausibly suggest that she combined with

Smith and Paramount to form an enterprise. The SAC and amended RICO case statement allege that Lawson was "recruited" by Smith and played a role in Smith's scheme to divert Mega's resources and payments on all four of the projects involved in the Smith Enterprise. Specifically, Mega claims that Lawson helped solicit non-enterprise partners on the Locust Towers, Barnes & Noble, and Rite Aid Projects as part of a concerted effort to defraud the plaintiffs, forged a Mega executive's signature on an invoice receipt, caused Mega to perform work on the Rondo-Pak and Barnes & Noble Projects for which it was not paid, coordinated with Smith to obtain work assignments for the benefit of his side business ventures, and agreed with the participants in the Rite Aid Project that, if Mega was selected to perform work at the site, she, Smith, and Plumbline would siphon off Mega's payments for themselves. Lawson also helped Smith divert and then kept money that was properly owed to Mega. See, e.g., SAC ¶¶ 43, 71, 78, 82, 87, 90, 94, 121, 153-54, 164; Am. RICO Case Stmt. at 4, 42, 47. In short, Mega alleges that Lawson assisted Smith on several key facets of the scheme that he had devised.

Viewing the allegations in the light most favorable to the plaintiffs, this entire scheme involved projects spanning from 2006 through 2008, with a break of only a few months between enterprise-related activities from the summer of 2007 until early 2008. These allegations demonstrate commonality of purpose,

i.e., using insider roles at Mega to divert its funds and resources, and structural relationships of a sufficient duration to establish a RICO enterprise.  See Boyle, 556 U.S. at 946.  The fact that Lawson served as Smith's assistant enforces the fact that a continuing relationship existed between them, separate and apart from the pattern of unlawful conduct.  See id. at 947; Turkette, 452 U.S. at 583.  Whether Mega can substantiate these allegations against Lawson at a later stage of these proceedings is a separate question and one the Court need not now address.[12]

The Court now turns to the Smith Defendants' contention that Paramount and Smith, a company and its owner/president, cannot combine as part of an association-in-fact enterprise.  The defendants appear to assert two related arguments: that

---

[12] The Court does take this opportunity to point out that at least one piece of evidence that Mega attached to the SAC does not help demonstrate Lawson's knowing participation in a RICO scheme.  Mega contends that Lawson "intercepted and stole" an invoice sent by Mega's engineer, redirecting it to Smith.  SAC ¶ 140.  Lawson's e-mail to Smith states that the "invoice came in" and asks Smith, "[i]s it yours?"  PX 29.  That e-mail, on its own, in no way suggests that Lawson was a willing confederate in efforts to divert business or money away from Mega.  In its briefing, Mega suggests that the Court cannot consider the evidentiary value of that e-mail and may only rely on how Mega describes Lawson's conduct in the SAC.  10/31/12 Pl.'s Supp. Br. at 4-8.  The Court disagrees, and fails to see how it is precluded from considering, in conjunction with the allegations of the SAC, an exhibit that Mega itself submitted, presumably to substantiate the plausibility of the claims made in its pleading. See Buck, 452 F.3d at 260 (noting that, when presented with a motion to dismiss, courts may consider exhibits attached to the complaint).  At this stage, though, the Court assumes that Mega relies on more than the substance of this e-mail when it alleges that Lawson "intercepted and stole" the invoice in question.

-30-

(1) neither Smith nor Paramount can be held liable as a person who conducted the affairs of the Smith Enterprise because they are also members of that alleged association-in-fact enterprise and (2) Smith and Paramount cannot combine to form an enterprise because they are one and the same.  Smith and Paramount have not offered sufficient support to carry the day on either argument.

It is well-established that to state a claim under § 1962(c), a plaintiff "must allege . . . the existence of two distinct entities: (1) a 'person' [who operates or manages the enterprise]; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."  Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001); see also Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258, 263 (3d Cir. 1995).  This principle flows from the language of the RICO statute, itself.  To be a person "employed by or associated with" a RICO enterprise, "a defendant must be a 'person' legally distinct from the 'enterprise' with which the person is employed or associated."  Bergrin, 650 F.3d at 266.

The defendants have not demonstrated that inclusion of both Smith and Paramount as members of the Smith Enterprise runs afoul of § 1962(c)'s distinctiveness requirement.  The cases they cite simply confirm the basic proposition that an enterprise and its participants must be distinct.  In Banks v. Wolk and Haroco, Inc. v. American National Bank & Trust Co., the Third and Seventh

Circuits, respectively, held that a company cannot serve as both the RICO enterprise and a defendant enterprise member. Banks, 918 F.2d 418, 421 (3d Cir. 1990); Haroco, 747 F.2d 384, 399-402 (7th Cir. 1984). That reasoning would presumably apply with equal force to an individual; he cannot be both participant and enterprise. Here, however, it is not alleged that Paramount or Smith was the enterprise. Mega instead contends that they were participants in a multi-member enterprise.

Moreover, the Third Circuit has determined that an association in fact composed of "a mixture of individual persons and 'entities that they control'" is an entity distinct from its members, satisfying the distinctness principle of § 1962(c). Bergrin, 650 F.3d at 266, 269-70 (quoting United States v. Masters, 924 F.2d 1362, 1366 (7th Cir. 1991) (Posner, J.)).[13] Under Bergrin, a defendant generally may be a member of an association-in-fact enterprise and also a participant in that enterprise. See also Atlas Pile Driving Co. v. DiCon Fin. Co., 886 F.2d 986, 995 (8th Cir. 1989) (same).

Although Bergrin focused on the distinctiveness of an

---

[13] The Seventh Circuit appears to have backed away from its reasoning in Masters on which the Bergrin court relied. In a more recent opinion, the Seventh Circuit rejected a plaintiff's contention that four corporations could combine with two of their employees and an unrelated company to constitute a RICO enterprise. Relying on the fact that a corporation acts through its employees, the court noted that "[t]o add the corporations to [the individual defendants], their employees, is thus to add nothing." Bachman v. Bear, Stearns & Co., 178 F.3d 930, 932 (7th Cir. 1999) (Posner, J.).

association-in-fact from its members, it also offers strong guidance as to whether an owner and his company may combine as part of an enterprise in the first place, at least when unrelated parties are also members. The Bergrin court cited with approval the idea that an association in fact can include both individuals and their businesses. Id. at 266. In Bergrin, the court found that five individual defendants and four corporations–including two law firms in which one of the defendants appears to have been a partner, an investment company, and a restaurant–formed a viable association-in-fact enterprise under RICO. Id. at 261-63, 268-70. A similar, though smaller enterprise is alleged here: Smith, his company, and a third party, Lawson. Bergrin suggests that there is no bar to Mega premising a RICO claim on this combination of individuals and an entity controlled by only one of them.

Though uncited by the parties, the Court is aware of decisions by various courts of appeals, including the Court of Appeals for the Third Circuit, finding that a corporation acting in tandem only with its employees cannot form a RICO enterprise and be a distinct "person" who conducts the affairs of that enterprise. In that scenario, the corporation, which can act only through its employees, is truly both enterprise and person, and a claim against it cannot satisfy § 1962(c)'s distinctiveness requirement. See Cruz v. FXDirectDealer, LLC, No. 12-1252, 2013

WL 3021904, at *4 (2d Cir. June 19, 2013) (precedential); <u>Living</u>
<u>Designs, Inc. v. E.I. Dupont de Nemours & Co.</u>, 431 F.3d 353, 361
(9th Cir. 2005); <u>Gasoline Sales, Inc. v. Aero Oil Co.</u>, 39 F.3d
70, 73 (3d Cir. 1994).

The case at bar raises slightly different issues,
however.  In contrast to the intra-corporation enterprises
discussed in <u>Gasoline Sales</u> and the other above circuit court
precedent, the Smith Enterprise involves a third-party member who
does not come within the other members' corporate sphere.
Inclusion of Lawson tends to negate the notion that the
enterprise is Paramount or Smith, simply called by another name,
and presents at least reason to doubt that distinctiveness
concerns defeat Mega's RICO claim against them.  <u>See</u> <u>Bergrin</u>, 650
F.3d at 266; <u>cf.</u> Gregory P. Joseph, <u>Civil RICO: A Definitive</u>
<u>Guide</u> § 11(B)(4), at 103 (3d ed. 2010) (noting that the
sufficiency of an alleged association in fact depends on "the
nexus between the individuals (and any affiliated or subordinate
entities), the acts, and the ordinary course of business of the
target (organizational) defendant among them").

Additionally, the above-cited cases address the issue
of distinctiveness when the corporation is both defendant
participant and an entity encompassing all enterprise members.
They do not speak to whether an individual employee or owner,
such as Smith, is distinct enough from an association in fact

-34-

comprised of him and his company to also be a "person employed by or associated with" the enterprise.  Finally, the Court has not uncovered any court of appeals case directly confronting the viability of a § 1962(c) claim against an owner and his solely owned company when they are *both* alleged to be enterprise members and persons who "conduct[ed] or participate[d] . . . in the conduct" of the enterprise's affairs through the owner's actions. The Court takes no definitive view on these issues, but merely notes that they present separate, yet pertinent, questions regarding the cognizability of RICO claims based on the Smith Enterprise.

Given the complexity of this area of RICO law and the fact that the parties have not addressed the above enumerated issues implicated by including Smith and Paramount as members and defendant participants in the Smith Enterprise, the Court will not at this time dismiss Count I against one or both of Smith and Paramount for lack of distinctiveness, either between them or between them and the alleged enterprise.

b.    Pattern of Racketeering Activity

The Court also finds that the allegations of Mega's pleadings sufficiently esablish a pattern of racketeering against

Smith and Paramount.[14]

Mega sufficiently alleges that Smith many times used the mails to fraudulently divert Mega's resources, job opportunities, and money to him and his confederates. For example, Smith submitted and counseled his partners to submit false change orders through the mail that understated by thousands of dollars the amount of work performed by Mega at the Locust Towers and Rite Aid Projects. Mega has attached most of the specific change orders as exhibits. See SAC ¶¶ 80-83, 87, 89-90, 100-09, 122-29. In its pleadings, Mega also explains how submission of these false invoices enabled Smith and his associates to perpetuate their alleged scheme. By causing the property owner to pay for the full amount of work done but invoicing a lesser amount to Mega, Smith and Lawson, with the help of confederates on these construction projects, were able to steal the difference or, in some instances, provide their strategic partners with unauthorized discounts. Smith and his partners also used the mails to transfer the diverted payments.

In addition, by ascribing to Paramount entities project work actually performed by Mega, Smith was able to divert money

---

[14] It is not always clear from the plaintiffs' allegations whether Smith's allegedly unlawful conduct can also be attributed to Paramount. Because the Smith Defendants do not address the proper attribution of putative predicate acts and challenge only whether a pattern of racketeering has been alleged, the Court does not parse Mega's pleadings to determine if Smith or Smith and Paramount, through Smith, have performed the racketeering activity required for each to be held liable under § 1962(c).

on the Barnes & Noble, Rondo-Pak, and Rite Aid Projects to which he and his business were not actually entitled. On the Barnes & Noble Project, for instance, Smith mailed a fraudulent invoice and forged certificate of insurance to the general contractor designed to elicit payments to a Paramount entity for work done using Mega's resources. Smith also caused Chesco and Cliggett to submit a fraudulent invoice to Mega that included $4,000 worth of line items for work done on behalf of Paramount at the Barnes & Noble Project site. Smith then had Mega transmit a check through the mail to pay this invoice, masking the fact that Mega was paying bills for a job that Smith and Paramount had effectively stolen from it. Smith also directed Rondo-Pak and Plumbline, which are based in Pennsylvania, to issue checks for work secured for and done by Mega, eventually depositing those checks in a New Jersey bank account. Am. RICO Case Stmt. at 44, 46, 48-50.

These allegations satisfy the heightened pleading requirement for claims of mail fraud and, in the case of the interstate diversion of money on the Rondo-Pak and Rite Aid Projects, the normal pleading requirements for offenses under the Stolen Property Act. See Lum, 361 F.3d at 223; 18 U.S.C. § 2314. Moreover, all of these acts are connected to projects spanning from at least late 2006 to November 2008, and all involve the same alleged victim, Mega, that Smith was able to harm financially through his position as an upper-level executive with

the company.  That period is sufficiently lengthy and the
individual acts sufficiently related to establish a continuous
pattern of RICO racketeering.  See Pelullo, 964 F.2d at 209-10.


                4.  U.S. Concrete Enterprise

        Turning to the U.S. Concrete Enterprise, the Court
finds that it fails at the threshold requirement of an
enterprise.  This is not, as the U.S. Concrete Defendants suggest
at one point in their briefing, because Mega has failed to
demonstrate that they ever knew, let alone joined together and
acted in concert with, the dismissed former defendants.  That
argument misstates the nature of the alleged U.S. Concrete
Enterprise.  According to Mega, the U.S. Concrete Enterprise is
composed solely of Smith, Lawson, and the U.S. Concrete
Defendants.  It is Mega's failure to allege sufficiently a
continued relationship and purpose among this smaller collection
of defendants that causes its RICO claim to falter.

        The allegations involving U.S. Concrete break down into
two sets of projects.  First, in March 2006, Smith allegedly
undercharged U.S. Concrete, in an unspecified amount and without
authorization, for work performed by Mega at two sites in New
Jersey.  U.S. Concrete remitted payment to Mega later that May.
Second, U.S. Concrete is alleged to have agreed with Smith to cap
the daily fees associated with rental of Mega's laser screed

equipment on various dates throughout October 2007.[15]

Although a RICO enterprise may "engage in spurts of activity punctuated by periods of quiescence," it "must function as a continuing unit." Boyle, 556 U.S. at 948. There is nothing in Mega's pleadings to suggest that Smith, Lawson, and the U.S. Concrete Defendants operated as a "continuing unit" from March 2006 through October 2007, including the almost-seventeen-month hiatus between the projects implicated as part of this enterprise. Rather than an ongoing association that sporadically engaged in criminal activity, the plaintiffs' pleadings depict two discrete and isolated instances in which Smith, with Lawson's help, provided unauthorized discounts to the same customer.

This is quite unlike the allegations underlying the Smith Enterprise, which involves activity by the Smith Defendants on a string of projects between 2006 and the fall of 2008. At most, there is a period of several months during which the Smith Enterprise may have lain dormant. During that time, however, Smith and Lawson remained work associates, suggesting that they

_____

[15] Mega contends that activities connected to this latter rental lasted from October 2007, when U.S. Concrete rented Mega's laser screed, to September 2008, when U.S. Concrete sent Mega a letter wrongly seeking reimbursement for costs associated with the rental. Nothing relating to this scheme is alleged to have occurred in that intervening year. Nor is it alleged that Smith or Lawson directed or consulted with the U.S. Concrete Defendants to send that invoice. The letter, standing alone, is an insufficient basis for inferring that the U.S. Concrete Defendants maintained relationships and pursued a common course of conduct with Smith and/or Lawson between October 2007 and September 2008.

maintained a relationship.  The reverse is true with respect to

the alleged U.S. Concrete Enterprise.  There were only

approximately two months over the span of two years in which its

alleged members engaged in any activity at all.  The plaintiffs'

allegations do not plausibly demonstrate a continued association

among the U.S. Concrete Defendants and Smith and Lawson during

this period, and even an informal or loosely organized RICO

enterprise cannot be inferred simply from the few above-

referenced projects.[16]  See Turkette, 452 U.S. at 583 (noting

that unlawful activity does not necessarily establish the

existence of an enterprise).


    B.    RICO Conspiracy Claims

        The RICO statute prohibits individuals from conspiring

to violate one of RICO's substantive provisions, such as

§ 1962(c).  18 U.S.C. § 1962(d).  To be held liable as a RICO

conspirator, a defendant need not himself commit or agree to

undertake all acts necessary to make out a § 1962(c) violation.

--------------------------------------------------

[16] The allegations pertaining to the U.S. Concrete
Enterprise are also dissimilar from the enterprise in Boyle
itself.  There, although a group of robbers was loosely
organized, had no leader or hierarchy, and maintained a
fluctuating membership, its core group robbed together for eight
years, committing well over thirty thefts.  Boyle, 556 U.S. at
941.  From these activities ongoing relationships and a shared,
continuing purpose could be inferred.  See id. at 951.  The far
less extensive and temporally distant acts implicated by the
alleged U.S. Concrete Enterprise can yield no such similar
inference of ongoing purpose and relationship.

<u>Salinas v. United States</u>, 522 U.S. 52, 65 (1997); <u>In re Ins.</u>
<u>Brokerage</u>, 618 F.3d at 372-73.  The defendant must, however,
agree to facilitate the commission of activities prohibited under
RICO.  <u>In re Ins. Brokerage</u>, 618 F.3d at 372-73 & n.71; <u>Smith v.</u>
<u>Berg</u>, 247 F.3d 532, 538 (3d Cir. 2001).  Consequently, a RICO
conspiracy claim cannot survive a motion to dismiss where the
plaintiff fails to allege sufficiently "'an endeavor which, if
completed, would satisfy all of the elements of a substantive
[RICO] offense.'"  <u>In re Ins. Brokerage</u>, 618 F.3d at 373 (quoting
<u>Salinas</u>, 522 U.S. at 65) (alteration in the original); <u>see also</u>
<u>Lightning Lube, Inc. v. Witco Corp.</u>, 4 F.3d 1153, 1191 (3d Cir.
1993).

Having determined that Mega has alleged sufficient
facts to make out a claim against Smith and Paramount for
actually violating § 1962(c) of RICO, the Court also finds that
the SAC plausibly alleges, through direct allegations and
reasonable inference, that these defendants agreed to engage in
such illegal activities in violation of RICO's anti-conspiracy
provision.

The Court reaches the opposite conclusion with respect
to the U.S. Concrete Enterprise.  The SAC and amended RICO case
statement do not plausibly allege that the members of the would-
be U.S. Concrete Enterprise conspired to commit any acts other
than those alleged in connection with the three New Jersey

construction projects outlined above.  Their joint endeavor to

underpay Mega on those three projects does not amount to a

violation of § 1962(c).  Any agreement between them, therefore,

was not a conspiracy to commit or facilitate a substantive RICO

offense.  The Court will dismiss or grant judgment in favor of

the moving defendants, as appropriate given the posture of their

respective motions, on Count IV of the SAC.


     C.   <u>Lanham Act Claim</u>

     Mega's final federal claim against the moving

defendants is a cause of action against Smith under the "unfair

competition" provision of the Lanham Act, 15 U.S.C.

§ 1125(a)(1)(A).[17]  Mega alleges that Smith infringed the

trademarks "'MEGA Construction Company' and/or 'MEGA

Construction' (collectively, the 'MEGA Mark')" under which Mega

conducts its business when he represented that Paramount was

---

[17] Section 1125(a)(1)(A) provides that

Any person who, on or in connection with any goods or
services, or any container for goods, uses in commerce any
word, term, name, symbol, or device, or any combination
thereof, or any false designation of origin, false or
misleading description of fact, or false or misleading
representation of fact, which . . . is likely to cause
confusion, or to cause mistake, or to deceive as to the
affiliation, connection, or association of such person with
another person, or as to the origin, sponsorship, or
approval of his or her goods, services, or commercial
activities by another person . . . shall be liable in a
civil action by any person who believes that he or she is or
is likely to be damaged by such act.

performing work that was actually completed using Mega labor and equipment.[18]   According to Mega, Smith's actions exceeded the scope of his "limited license" to use the Mega Mark enjoyed as a consequence of his employment with the company.  SAC ¶¶ 227-234.

To state a claim of unfair competition in violation of the Lanham Act, a plaintiff must allege that (1) the defendant used a false designation of origin; (2) the use of the false designation of origin occurs in interstate commerce in connection with goods and services; (3) such false designation is likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval of the defendant's goods or services by another person; and (4) the plaintiff has been or is likely to be damaged.  Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1428 (3d Cir. 1994).

Smith attacks Mega's Lanham Act claim on the grounds that none of his conduct occurred "in interstate commerce" or potentially caused the former defendants with whom he partnered to be confused as to the origin of goods and services that he provided.  The Court finds these challenges unmeritorious.

_____

[18] Mega also confusingly asserts in the SAC that Smith's conduct caused property owners to "believe[] they were receiving MEGA Construction's services when, in fact, they were receiving services of one or more of the Defendants or no services at all." SAC ¶ 235.  The other allegations of the SAC do not support this contention.  Rather, they demonstrate that, with respect to the Barnes & Noble Project, Smith possibly led the property owner to believe that it was receiving *Paramount's* services when it was actually receiving work done by Mega personnel.

First, as Mega correctly argues, one project at which Smith allegedly passed off Mega's work as the work of Paramount occurred in interstate commerce: the Barnes & Noble Project was based in Cherry Hill, New Jersey, across the border from Mega and Paramount, which are located in Pennsylvania. On that project, Smith contracted with the general contractor on behalf of Paramount, but in truth used Mega's manpower and materials. See SAC ¶¶ 154-64. Second, it is not Chesco and Cliggett, the former defendants working with Smith on the Barnes & Noble Project, who Mega alleges were potentially confused by his conduct. Instead, Mega claims that Smith's misrepresentation as to the source of project labor could well have confused the Barnes & Noble general contractor and property owner who authorized the work, a plausible allegation. Because Smith offers no other basis for concluding that Mega's Lanham Act claim against him fails, the Court refrains from analyzing the legal or factual sufficiency of any other aspect of this claim.

Finally, the Court concludes that, as with Mega's RICO claims, Mega's Lanham Act claim is not foreclosed by law of the case. In its prior 2011 decision in this matter, the Court addressed Mega's argument that it was "reasonable to infer" from the facts alleged that the former defendants engaged in deceptive acts designed to pass off Mega's services as those of other defendants. Mega Concrete, 2011 WL 1103831 at *13-14 (quotation

marks omitted).  The Court deemed Mega's position, which was built wholly on supposition rather than direct factual allegation, too speculative and conclusory to state a claim of unfair competition.  Id.  The claim against Smith is factually distinct and expressly alleges that he lied about who was doing the work on the Barnes & Noble Project, making false statements and submitting a falsified insurance certificate to the project's general contractor.  SAC ¶¶ 154-56, 162-64.  The legal sufficiency of this claim was not decided as part of the Court's earlier decision and is not governed by the law of the case doctrine.

III. <u>Conclusion</u>

For the foregoing reasons, the Court will grant the U.S. Concrete Defendants' motion for judgment on the pleadings and will grant in part and deny in part the motion to dismiss filed by Smith and Paramount.  An appropriate order issues separately.